**PUBLIC SERVICE COMPANY OF COLORADO, Petitioner/Cross–Respondent,**

v.

**WALLIS AND COMPANIES, Respondent/Cross–Petitioner.**

No. 97SC792.

Supreme Court of Colorado.
En Banc.

Sept. 13, 1999.

Rehearing Denied Nov. 1, 1999.*

---

\* Justice SCOTT would strike the Petition for Rehearing filed by Amicus Curiae Union Pacific Railroad Company.

Slivka, Robinson, Waters & O'Dorisio, P.C., Richard P. Slivka, Margaret M. McClellan, Susan R. Pierson, Denver, Colorado Attorneys for Petitioner/Cross–Respondent.

William H. ReMine, P.C, William H. ReMine, Denver, Colorado, Overton & Feeley, P.C., Robert W. Smith, Denver, Colorado, Hancock, Rothert & Bunshoft LLP, William J. Baron, San Francisco, California [Continued] Hancock, Rothert & Bunshoft, LLP, Laura A. Pace, Los Angeles, California Attorneys for Respondent/Cross–Petitioner.

Inman Flynn & Biesterfeld, P.C., Joel A. Moritz, Richard P. Brentlinger, Michael J. Glade, Robert J. Thomas, Denver, Colorado, Geoffrey T. Wilson, Denver, Colorado, Attorneys for Amicus Curiae Colorado Municipal League.

Steven E. Napper, Denver, Colorado, James P. Gatlin, Omaha, Nebraska, Jenner & Block, Richard J. Gray, Brent D. Stratton, Melissa C. Brown, Paul Walker–Bright, Chicago, Illinois, Attorneys for Amicus Curiae

Union Pacific Railroad Company as Successor–in–Interest to The Denver and Rio Grande Western Railroad Company.

Roberts & Zboyan, P.C., JoAnne M. Zboyan, Denver, Colorado, Attorneys for Amicus Curiae Insurance Environmental Litigation Association.

Justice BENDER delivered the Opinion of the Court.

In this case involving liability insurance coverage for environmental pollution, we address several distinct issues concerning the pollution exclusion clause and the allocation of liability among numerous consecutive policies.

A jury found that the insurer, Wallis and Companies (Wallis), was required to indemnify its insured, Public Service Company of Colorado (PSC), for several million dollars in costs that PSC incurred by cleaning up environmental pollution at two sites: the Barter Yard and the Lowry Landfill. Ruling that the trial court had erroneously instructed the jury that Wallis had the burden of proving the inapplicability of the exception to the pollution exclusion clause contained in some of the Wallis policies, the court of appeals held that Wallis was entitled to a new trial. See Public Serv. Co. v. Wallis & Cos., 955 P.2d 564, 569 (Colo.App.1997). We did not grant certiorari on this issue. However, we granted certiorari to review three other holdings in the court of appeals' opinion.

First, the court of appeals affirmed the trial court's instruction to the jury that the phrase "sudden, unintended and unexpected" in the exception to the pollution exclusion clause means "unexpected or unintended." See Wallis, 955 P.2d at 569. We agree with the conclusion of the court of appeals that this phrase is ambiguous and therefore must be construed against the insurer and in favor of policy coverage. We also agree that the term "sudden" does not have a purely temporal connotation. However, we cannot approve of the instruction given in this case, and thus we reverse this holding of the court of appeals.

Second, the court of appeals held that in applying the "sudden, unintended and unex-

pected" exception to the pollution exclusion clause, the relevant inquiry is whether the pollution resulted from a happening that was unintended and unexpected "from the standpoint of those in control of the contaminants." Id. at 570. We reverse the court of appeals on this issue, and we hold that the relevant inquiry is whether the pollution resulted from a happening that was sudden, unintended and unexpected from the standpoint of the insured.

Third, the court of appeals affirmed the trial court's ruling that it was not appropriate to allocate liability for pollution cleanup among the various insurance policies implicated by the years of polluting activities according to the time-on-the-risk method of allocation. See id. at 572. We reverse this ruling of the court of appeals. In cases of continuous, progressive, and indivisible environmental damage, where it would be unreasonable to expect juries to allocate actual damages to specific policy periods, we hold that liability must be allocated proportionally among insurance policies according both to time-on-the-risk and to the degree of risk assumed.

## I. FACTS AND PROCEEDINGS BELOW

We rely almost verbatim on the court of appeals' rendition of a substantial portion of the underlying facts of this case, forming the necessary background to our analysis. See Wallis, 955 P.2d at 566. PSC sued Wallis, representatives of certain underwriters at Lloyd's of London and other London market insurance companies, for the costs of environmental cleanup activities resulting from PSC's contamination of the Barter Yard and the Lowry Landfill.

Barter Machinery & Supply Company was in the scrap metal business. From the late 1940s until 1985, PSC sold scrap electrical equipment containing lead and polychlorinated biphenyls (PCBs) to Barter. These substances contaminated the soil and groundwater at the scrap yard. When Barter notified PSC of the contamination, the two entities investigated the nature and scope of the contamination to determine the cost of remediation. Because Barter could not afford the

cost of the cleanup, PSC agreed to fund the cleanup in exchange for title to the site. PSC and the Environmental Protection Agency (EPA) agreed on the appropriate extent of the cleanup, and cleanup activities began in 1992.

Between 1966 and 1980, along with approximately 200 other industrial entities, PSC arranged for the disposal of industrial wastes at the Lowry Landfill. In 1984, EPA placed the landfill on its National Priorities List (commonly known as the "Superfund" list) pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 to 9675 (1998). Then in 1988, EPA notified PSC that it was a "potentially responsible party" (PRP). Ultimately, PSC entered into an agreement with Waste Management, Inc., under which PSC paid a certain sum in exchange for full indemnification for its liability at Lowry.

PSC filed suit against the insurance companies that had issued liability insurance policies to PSC during the relevant time periods, seeking indemnification for its expenses incurred with respect to these sites. All of the insurers except Wallis reached settlement with PSC before trial.

Wallis had issued excess insurance policies to PSC from 1955 through 1977. From 1969 through 1985, PSC was also covered by excess insurance policies issued by the insurance companies that reached a settlement with PSC. Thus, from 1969 through 1977, PSC was covered by excess insurance from both Wallis and the other insurers.

Excess insurance policies are often issued specifically with reference to a primary policy that must be exhausted before the insured is entitled to coverage from the excess insurer. In this case, however, PSC was not covered by primary liability insurance from 1955 through 1977. Instead, PSC had certain amounts of self-insured retentions (SIRs) that PSC was required to exhaust before it was entitled to coverage under the excess policies issued by Wallis. In each of the years from 1955 through 1959, PSC retained an SIR in the amount of $25,000. In each of the years from 1960 through 1976, PSC had an SIR of $100,000. In 1977, PSC had an SIR of $500,000.

At trial, the court instructed the jury in accordance with a "continuous trigger" theory of policy coverage. Specifically, the trial court instructed the jury that environmental contamination beginning in one policy period and continuing over several successive policy periods would be considered as only one occurrence under the policies.[1] The trial court then instructed the jury that insurance coverage could be triggered by the initial release of contaminants into the environment, by any contamination resulting from that release, or by the date that PSC discovered the contamination.[2]

The Wallis policies providing excess coverage to PSC for the years 1971 through 1977 contained the following pollution exclusion clause that excludes coverage for the cost of remediation for pollution *unless* that pollution was caused by a sudden, unintended and unexpected happening:

This Insurance does not cover any liability for:

(2) The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances unless the seepage, pollution or contamination is caused by a sud-

---

1. The instruction issued by the trial court reads as follows:

 Each of the insurance policies issued to Public Service by defendants provided coverage for an "occurrence" during the term of that particular policy. If environmental contamination began in one policy period and continued over several successive policy periods, this would be considered as only one "occurrence" within the meaning of the London insurance policies issued to Public Service by defendants.

2. The instruction issued by the trial court reads as follows:

 If you find that the environmental contamination at the Lowry site [or] the Barter site . . . was a result of a continuous and progressive process occurring over several years, Public Service is entitled to claim coverage under any policy in effect at the time any of the following occurred: (1) the initial release of contaminants into the environment occurred; (2) any contamination resulting from that release of contaminants occurred; and (3) the date Public Service discovered the contamination resulting from the release of contaminants into the environment.

den, unintended and unexpected happening during the period of this Insurance.

The trial court instructed the jury that this clause excluded coverage unless the pollution resulted from a happening that was unexpected or unintended by PSC:

> The phrase "sudden, unintended and unexpected" is ambiguous because it is susceptible to more than one reasonable interpretation. You are instructed that, in this case, the phrase "sudden, unintended and unexpected" as used in this exclusion means "unexpected or unintended" from the standpoint of Public Service.

The trial court also instructed the jury that the burden of proof was on Wallis to establish that the exception to the pollution exclusion clause was not applicable. In other words, according to the trial court's instruction, Wallis was required to establish that PSC expected and intended the happenings resulting in the pollution in order for the pollution exclusion clause to operate to exclude coverage.

The jury answered questions on special verdict forms for both the Barter and Lowry sites.

With respect to the Barter site, the jury found that an "occurrence" had taken place and that policies issued in years 1955 through 1977 had been triggered. The jury also found that PSC had neither expected nor intended the release of pollution into the environment. Finally, the jury determined that PSC's "ultimate nett [3] loss," as that term was defined in the insurance policies, was $5,650,978.82.

With respect to the Lowry site, the jury found that an "occurrence" had taken place and that policies issued in years 1968 through 1977 had been triggered. The jury also found that PSC had neither expected nor intended the release of pollution into the environment. Finally, the jury determined that PSC's "ultimate nett loss" was $1,457,-007.64.

Wallis filed a post-trial Motion for Determination of Judgment Allocation and Set-off with the trial court. In this motion, Wallis argued that the judgments for each site must be allocated on a pro rata, "time-on-the-risk" basis. Under this allocation scheme, the total amount of liability for each site would be divided equally across all policy-years from the time of the first release of contamination until the date that PSC discovered that contamination. Wallis argued that PSC was responsible for one SIR for each triggered policy-year. According to Wallis' calculations, such an allocation scheme would reduce the judgment for the Barter site from $5,650,978.82 to $1,390,569.32 and would reduce the judgment for the Lowry site from $1,457,007.64 to zero. Wallis also asserted that it was entitled to have the amounts that PSC received from settlements with its other insurers deducted as a set-off from the judgments against Wallis.

The trial court ruled that it would not allocate the judgments for the Barter and Lowry sites among the years from initial contamination to discovery. In support of its ruling, the trial court found that the contamination at both the Barter and the Lowry sites was the result of a gradual and continuous seepage of contaminants occurring over a period of years. Finding that there was only one occurrence at each site, and noting that the policies provide that "any and all sums" arising from an occurrence are covered, the trial court ruled that PSC was entitled to obtain indemnification for the entire amount of its "ultimate nett loss" under any policy triggered. However, the trial court granted Wallis a set-off for the amounts that PSC received from the insurance companies that had settled with PSC earlier in this litigation.

Thereafter, the court of appeals affirmed in part, reversed in part, and remanded this case for a new trial. *See Wallis,* 955 P.2d at 566.

Regarding the London pollution exclusion clause,[4] the court of appeals held that a new

---

**3.** Consistent with the wording of the Wallis policies, we use the British spelling of the term "net" in this opinion.

**4.** We refer to the pollution exclusion clause in the Wallis policies as "the London pollution exclusion clause" to distinguish it from the standard pollution exclusion clause that we construed in *Hecla Mining Co. v. New Hampshire*

trial was necessary because the trial court had improperly instructed the jury that Wallis bore the burden of proving the inapplicability of the exception to the London pollution exclusion clause. *See id.* at 569. The court of appeals held that "PSC should have had the burden of proving that the happening that caused the contamination was sudden, unintended, and unexpected." *Id.* PSC did not seek certiorari on this issue.

We granted certiorari to review two other rulings of the court of appeals, interpreting the London pollution exclusion clause. The court of appeals held that the trial court did not err by instructing the jury that "sudden, unexpected and unintended" meant "unexpected or unintended." *Id.* Relying on this court's decision in *Hecla,* the court of appeals declined to hold that the term "sudden" necessarily carries temporal connotations of rapidity or abruptness:

> In *Hecla,* the court refused to attach a solely temporal connotation to the word "sudden" because it would result in an inherent contradiction to specific policy language defining an occurrence as "continuous or repeated exposure." Here, in contrast, there is no such inherent contradiction, but because the phrase is subject to more than one interpretation and is not further defined in the policy, it must be construed in favor of the insured and against the insurer who drafted the contract.

*Wallis,* 955 P.2d at 569 (citing 811 P.2d at 1092).

Additionally, the court of appeals held that in interpreting the exception to the London pollution exclusion clause, it is irrelevant whether PSC intended the contamination:

> [W]hether PSC expected or intended the contamination is not relevant; the proper inquiry is whether those in control of the contaminants expected or intended the actions which resulted in contamination.
>
> . . . .
>
> [I]f Wallis meets its burden of establishing the applicability of the pollution exclusion,

*Insurance Co.,* 811 P.2d 1083, 1087 n. 6 (Colo. 1991), and more recently in *Compass Insurance Co. v. City of Littleton,* 984 P.2d 606, 614–18

PSC can prevail only if it establishes that the contamination was the result of an unintended and unexpected happening (*from the standpoint of those in control of the contaminants* ) during those policy periods.

*Id.* at 570 (emphasis added).

Regarding the issue of allocation, the court of appeals affirmed the trial court's denial of Wallis' motion for allocation. *Id.* at 572. The court of appeals noted that "courts that have adopted this allocation method have done so primarily in order to allocate a judgment among several insurers, not necessarily to limit the insured's recovery." *Id.* The court of appeals stated that "time-on-the-risk" allocation in this case "is unnecessary and would lead to an inequitable result." *Id.* Finally, the court of appeals found that the trial court's order requiring set-off for the amounts of settlement that PSC had reached with its other insurers protected Wallis "from bearing other insurers' liability for PSC's damages." *Id.*

We granted certiorari on the following issues:

> Whether the phrase "sudden, unintended and unexpected" in the pollution exclusion used in London Market liability insurance policies has a temporal element.

> Whether the court of appeals erred in determining that Public Service Company of Colorado must show that the contamination was the result of an "unintended and unexpected" happening from the standpoint of those in control of the contaminants.

> Whether liability for insurance coverage of environmental property damage must be allocated across all the years in which such damage occurred, or must a single insurer be forced to indemnify for property damage occurring not only during its own policy period but also before and after its policy period.

(Colo.1999), because the language of the two clauses differs.

## II. THE "SUDDEN, UNINTENDED AND UNEXPECTED" EXCEPTION TO THE LONDON POLLUTION EXCLUSION

Two of the issues we agreed to review involve the interpretation of the London pollution exclusion clause contained in some of the Wallis policies:

This Insurance does not cover any liability for:

(2) The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances unless the seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance.

We agree with the reasoning of the court of appeals that the term "sudden" is ambiguous and therefore must be construed, against the insurance company that drafted the contract, not to include a temporal connotation. However, we do not agree that the trial court's instruction that the phrase "sudden, unintended and unexpected" means "unexpected or unintended" was proper, and therefore we reverse the holding of the court of appeals affirming the issuance of that instruction to the jury. We hold that in the London pollution exclusion clause, the phrase "sudden, unintended, and unexpected" means "unprepared for, unintended, and unexpected."

We also reverse the holding of the court of appeals that the relevant inquiry in applying the "sudden, unintended and unexpected" exception to the London pollution exclusion is whether the happening was unintended and unexpected "from the standpoint of those in control of the contaminants." *Wallis*, 955 P.2d at 570. Finding the phrase "sudden, unintended and unexpected" to be ambiguous with respect to whose standpoint is relevant, we construe this provision in favor of policy coverage and hold that the relevant inquiry is whether the happenings were sudden, unintended and unexpected from the standpoint of the insured.

### A. WHETHER "SUDDEN" NECESSARILY CARRIES A TEMPORAL CONNOTATION

■ As background to our discussion of this issue, we begin with a brief examination of this court's decision in *Hecla*. In *Hecla*, we were asked to interpret an exception in a pollution exclusion clause providing that coverage is restored if the discharge of the pollutant was "sudden and accidental:"

This insurance does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental ....*

*Hecla*, 811 P.2d at 1086–87 (emphasis added). Applying the general principles that undefined contract terms are ambiguous when they are "susceptible to more than one reasonable interpretation" and that ambiguous contract language "must be construed in favor of the insured and against the insurer who drafted the policy," we held for the insured. *Id.* at 1090–91. Specifically, we found the term "sudden" to be ambiguous, and we construed the phrase "sudden and accidental" against the insurer to mean "unexpected and unintended." *Id.* at 1092. Supporting this interpretation was our reasoning that the temporal connotation urged by the insurers in that case would conflict with other portions of the insurance policies at issue, rendering the phrase "sudden and accidental" contradictory and meaningless:

If we were to construe "sudden and accidental" to have a solely temporal connotation, the result would be inconsistent definitions within the [comprehensive general liability] policies. In the portion of the policies defining occurrence, accident is defined to include "continuous or repeated exposure to conditions, which result in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." If "sudden" were to be given a temporal connotation of abrupt or immediate, then the phrase "sudden and accidental discharge" would mean: an abrupt or immediate, and continuous or

repeated discharge. The phrase "sudden and accidental" thus becomes inherently contradictory and meaningless.

*Id.*

In this case, the trial court presumably relied on our holding in *Hecla* as the basis for its instruction to the jury that the phrase "sudden, unintended and unexpected" in the London pollution exclusion means "unexpected or unintended" from the standpoint of the insured.[5] *See Wallis,* 955 P.2d at 569.

The court of appeals relied on *Hecla* to hold that the term "sudden" in the pollution exclusion at issue in this case is ambiguous and therefore should be construed against the insurer:

In *Hecla,* the court refused to attach a solely temporal connotation to the word "sudden" because it would result in an inherent contradiction to specific policy language defining an occurrence as "continuous or repeated exposure." Here, in contrast, there is no such inherent contradiction, but because the phrase is subject to more than one interpretation and is not further defined in the policy, it must be construed in favor of the insured and against the insurer who drafted the contract.

*Id.*

Wallis argues that the court of appeals erred by applying the reasoning of *Hecla* to the facts of this case for two reasons. First, the wording of the London pollution exclusion, included in some of Wallis' policies, differs from the pollution exclusion construed in *Hecla.* The phrase construed in *Hecla* was "sudden and accidental," whereas the phrase construed by the court of appeals in *Wallis* was "sudden, unintended and unexpected." *Hecla,* 811 P.2d at 1092; *Wallis,* 955 P.2d at 569. Thus, Wallis contends, the trial court's instruction equating "sudden, unintended and unexpected" with "unexpect-

ed or unintended" effectively removes the word "sudden" from the contract.[6]

Second, Wallis argues, *Hecla* is inapposite because our holding in that case was partly based on reading the phrase "sudden and accidental" in context with other portions of the policies – namely, the definition of "accident" in the policies at issue in that case encompassed a "continuous or repeated exposure to conditions," which conflicts with a definition of "sudden" that implies abruptness or immediacy. *See Wallis,* 955 P.2d at 569. Wallis asserts that its policies do not combine the term "sudden" with the term "accidental," and therefore they contain no such inherent contradiction when "sudden" is read to mean "abrupt." *See id.*

Although we are persuaded by some of Wallis' reasoning, ultimately we do not share Wallis' conclusion that "sudden" must be construed to have a temporal element. However, we hold that the trial court's instruction was erroneous nonetheless.

There exists a split of authority concerning the interpretation of the term "sudden" in the London pollution exclusion clause. Some courts have held that the term "sudden" in the phrase "sudden, unintended and unexpected" is unambiguous and means "abrupt." *See EDO Corp. v. Newark Ins. Co.,* 878 F.Supp. 366, 375 (D.Conn.1995) (applying New York and Connecticut law); *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.,* 693 A.2d 1059, 1061 (Del.1997). These courts similarly held that the term "sudden" in the "sudden and accidental" pollution exclusion clause was unambiguous and means "abrupt." *See EDO,* 878 F.Supp. at 374. Other courts have held that the contract language "sudden, unexpected and unintended" does not impose a temporal requirement. *See Hatco Corp. v. W.R. Grace & Co.-Conn.,* 801 F.Supp. 1334, 1351 (D.N.J.1992) (finding the term "sudden" to be ambiguous and

---

**5.** We note that this instruction was partly in error because the instruction read "unexpected *or* unintended" instead of "unexpected *and* unintended," though that issue is not before us today.

**6.** Wallis further argues that interpreting the term "sudden" to mean "unexpected and unintended" essentially transforms the contract language at issue here into a redundancy: "sudden, unin-

tended and unexpected" would become "unexpected and unintended, unintended and unexpected." This argument misapprehends our holding in *Hecla.* We did not hold that the term "sudden" meant "unexpected and unintended." Rather, we held that the phrase "sudden and accidental" meant "unexpected and unintended." *Hecla,* 811 P.2d at 1092.

therefore construing it against the drafter) (applying New Jersey law); *Time Oil Co. v. Cigna Property & Cas. Ins. Co.*, 743 F.Supp. 1400, 1408 (W.D.Wash.1990) (relying on Washington case law holding that the term "sudden" in the context of the "sudden and accidental" pollution exclusion clause means "unforeseen and unexpected").

We agree with Wallis that it was error for the trial court to instruct the jury that the phrase "sudden, unintended and unexpected" means "unexpected or unintended." In our view, in the context of the London pollution exclusion, "sudden" must be read to mean something other than "unintended" or "unexpected," because otherwise the term "sudden" would be surplus language. However, we do not agree with Wallis' conclusion that the term "sudden" is therefore unambiguous and means "abrupt."

■ We return to the principle that ambiguous contract terms are those that are reasonably susceptible to different meanings. *See Chacon v. American Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo.1990). In addition to meaning "unintended" or "unexpected," the term "sudden" can be used to mean "happening or coming without warning or premonition" or "unpremeditated, done without forethought," *see Hatco*, 801 F.Supp. at 1350; "unforeseen," *see Time Oil*, 743 F.Supp. at 1408; and "not prepared for," *see Webster's New World Dictionary* 2284 (3d. ed.1994). Of course, we recognize that these terms are similar to each other, but each has its own distinct meaning. Therefore, we hold that the term "sudden" in the London pollution exclusion is ambiguous. Because it is ambiguous, this term must be construed against the insurer who drafted the policies and in favor of the insured. *See Hecla*, 811 P.2d at 1090.

■ In construing the meaning of "sudden" in the London pollution exclusion clause, we are guided by the general rule of contract construction that a court should seek to "give effect to all provisions so that none will be rendered meaningless." *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo.1984). As we noted above, "sudden" may be given any of several interpretations, each with similar but distinct

meanings. In order to give meaning to the term "sudden" so that the term is not rendered meaningless by the other terms in the provision, we construe the term "sudden" in the London pollution exclusion clause to mean "not prepared for." Thus, we construe the phrase "sudden, unintended and unexpected" in the London pollution exclusion clause to mean "unprepared for, unintended and unexpected."

In conclusion, while we generally agree with the reasoning of the court of appeals, we reverse its holding that the trial court's instruction – which told the jury that "sudden, unintended and unexpected" means "unexpected or unintended"—was proper. On retrial, the jury should be instructed that the phrase "sudden, unintended and unexpected" means "unprepared for, unintended and unexpected."

### B. "UNINTENDED AND UNEXPECTED"—FROM WHOSE PERSPECTIVE?

■ Like the pollution exclusion clause that we construed in *Hecla*, the London pollution exclusion contains an exception that restores policy coverage under certain circumstances. Under the London pollution exclusion, policy coverage is restored when the pollution resulted from happenings that are sudden, unintended and unexpected. The court of appeals held that in applying this exception to the London pollution exclusion clause, the relevant perspective is that of "those in control of the contaminants." *Wallis*, 955 P.2d at 570. We disagree. We hold that this portion of the pollution exclusion clause is ambiguous with respect to whose perspective is relevant, and therefore we construe the exclusion against the insurer who drafted the policies and in favor of the insured. *See Hecla*, 811 P.2d at 1090. Thus, we reverse the court of appeals on this issue.

The exception to the London pollution exclusion is silent on the question of whose perspective is relevant. The London pollution exclusion reads as follows:

This Insurance does not cover any liability for:

(2) The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances *unless the seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance.*

(Emphasis added.) The parties are in dispute about whether the exception should be interpreted to mean that the "happening" must be sudden, unintended and unexpected from the standpoint of the insured or from the standpoint of those in control of the contaminants.

The court of appeals reversed the trial court and held for Wallis on this issue:

> Whether PSC expected or intended the contamination is not relevant; the proper inquiry is whether those in control of the contaminants expected or intended the actions which resulted in contamination.
>
> . . . .
>
> . . . [I]f Wallis meets its burden of establishing the applicability of the pollution exclusion, PSC can prevail only if it establishes that the contamination was the result of an unintended and unexpected happening. *(from the standpoint of those in control of the contaminants )* during those policy periods.

*Wallis,* 955 P.2d at 570 (emphasis added).

PSC argues that this exception to the pollution exclusion clause is ambiguous on the issue of whose standpoint should be examined. If we accept PSC's argument, then we must apply the longstanding rule that ambiguous language in insurance policies is to be construed against the insurer who drafted the policy. *See Hecla,* 811 P.2d at 1090.

On the other hand, Wallis argues that the policy language is not ambiguous and that the court of appeals correctly ruled that PSC must establish that the happening was unintended and unexpected from the standpoint of those in control of the contaminants.

Technically speaking, this is a matter of first impression before this court. However, we recently decided an analogous issue in a case involving uninsured motorist insurance coverage. In *State Farm Mutual Automobile Insurance Co. v. McMillan,* 925 P.2d 785 (Colo.1996), we considered whether the injuries sustained by McMillan, who had been intentionally shot by another motorist while driving in her car, were "caused by an accident" and therefore covered by McMillan's uninsured motorist insurance. The insurance company in *McMillan* argued that because the shooter had intended to shoot McMillan, it could not be said that McMillan's injuries were "caused by an accident." *McMillan,* 925 P.2d at 792. Specifically, the insurer argued that "the phrase 'caused by an accident' is not ambiguous because either an event is an accident or it is not." *Id.* at 793. We rejected this argument, found the phrase to be ambiguous, and construed it against the insurer. *Id.* Thus, we joined "a majority of jurisdictions" and held "that the determination of whether an 'accident' has occurred should be viewed from the standpoint of the insured." *Id.* at 793. In support of our holding, we quoted at length from an Ohio case that we found presented "compelling" reasons for viewing the incident from the standpoint of the insured:

> The [insureds] have paid the insurance premiums and have consciously contracted with the [insurer] for protection. The intent in the mind of the insured at the time of injury should determine whether the acts are accidental or intentional. To look through the eyes of the uninsured rather than the insured in this factual situation would require an unconscionable twisting of the obvious purpose of purchasing insurance coverage.
>
> All reason and logic would require a construction and interpretation that intent of mind should be taken from the viewpoint of the insured.

*Id.* (quoting *Celina Mut. Ins. Co. v. Saylor,* 35 Ohio Misc. 81, 301 N.E.2d 721, 723 (Ohio Misc.1973)).

We are persuaded by the reasoning of *McMillan* as we interpret the policy language at issue in this case. We hold that the policy language here is ambiguous with respect to whose viewpoint should be exam-

ined.[7] Thus, we construe this phrase against the insurer to mean "sudden, unintended and unexpected" from the standpoint of the insured, or in this case, PSC. This interpretation is consistent with the general nature of insurance coverage and specifically with the insured's decision to purchase insurance to protect itself against incurring certain costs that it is unable to predict. Therefore, we reverse the court of appeals decision with respect to this issue, and we order that this case be remanded to the trial court with directions to instruct the jury on retrial in accordance with our holding today.

## III. ALLOCATION OF LIABILITY ACROSS POLICY–YEARS

 The third issue that this court agreed to review was the proper method for allocating liability among insurance policies. The court of appeals affirmed the trial court's decision allowing PSC to "pick and choose" a single policy under which PSC could seek indemnification for the full costs of remediating the sites. The court of appeals declined to adopt the time-on-the-risk method of allocation urged by Wallis. *See Wallis*, 955 P.2d at 572.

Because we find that the method of allocation of liability applied by the court of appeals was unreasonable and, in part, based on an incorrect interpretation of case law, we reverse the court of appeals on this issue. We hold that, should Wallis be found liable after a new trial, the damages must be allocated according to time-on-the-risk and the relative degree of risk assumed. Under this method, the "ultimate nett loss" sustained for each site must be reduced by one SIR per policy-year per site. However, Wallis is not then also entitled to a set-off for the amounts that PSC received in settlement agreements with the other insurance companies that were previously involved in this litigation.

As a framework for our discussion, we take note of the atypical nature of the problem presented when an insured faces liability for long-term environmental pollution that spans multiple successive insurance policy periods.

The typical occurrence covered by a liability policy is something akin to a car accident. "Losses of this nature are relatively easy to identify because damages are both immediate and finite, and can be measured quite simply against the limits of the policy or policies in effect on the date of the accident." William R. Hickman & Mary R. DeYoung, *Allocation of Environmental Cleanup Liability Between Successive Insurers*, 17 N. Ky. L.Rev. 291, 292 (1990). By contrast, the interpretation of liability policies in the context of long-term environmental pollution is not so clear-cut. In such cases, "correlating degrees of damage to particular points along the loss timeline may be virtually impossible. This has led to substantial uncertainty as to how responsibility for such losses should be allocated where multiple insurers have issued successive policies to the insured over the period of time the damage was developing." *Id.*

## A. PSC'S INSURANCE STRUCTURE

The structure of PSC's insurance from the 1950s through the 1970s was fairly complex. All of the Wallis policies at issue in this case are excess policies. An excess policy is typically issued in reference to some underlying primary insurance policy whose limit must be exhausted before the excess policy attaches. However, PSC did not carry primary insurance policies from 1955 through 1977. Rather, the Wallis policies are excess to PSC's self-insured retentions (SIRs). For each Wallis policy in effect from 1955 through 1959, PSC had an SIR in the amount of $25,000. From 1960 through 1976, the SIRs were $100,000. Finally, PSC's SIR for its 1977 Wallis policy was $500,000.

PSC also had several different layers of excess policies. Thus, some of the Wallis policies were excess to other Wallis excess policies. For example, for the year 1963, PSC had an SIR of $100,000 and then four layers of excess policies with Wallis. The first layer of excess coverage was from $100,-000 to $500,000. The second layer of excess

---

7. We note that if Wallis had intended the pollution exclusion to mean "from the standpoint of those in control of the contaminants," it could have written such language into the contract. It chose not to do so, and it must bear the consequences of that choice.

coverage was from $500,000 to $1,000,000. The third layer of excess coverage was from $1,000,000 to $5,000,000. The fourth layer of excess coverage was from $5,000,000 to $15,000,000.[8]

Moreover, within the same layer of excess coverage, PSC sometimes had more than one policy on the risk. From 1969 through 1977, other insurers issued excess insurance to PSC for particular excess layers of risk that Wallis was also indemnifying. Thus, for a certain layer of excess risk in a given year, it was often the case that both Wallis and another insurer were on the risk. The relative proportions of the risk borne by each insurer was expressed as percentages in the policies.

## B. POLICY PROVISIONS

In addition to outlining the structure of PSC's insurance coverage during the relevant time period, we also find it useful to discuss the key terms contained in the Wallis policies.[9]

### 1. "Any and all sums"

The excess policies that Wallis issued to PSC contracted to indemnify PSC for "any and all sums" for which PSC became liable as a result of property damage caused by or growing out of an occurrence:

> To indemnify the Assured for any and all sums which they, the Assured, shall be legally liable to pay and shall pay as damages, direct or consequential, and/or expenses, as more fully defined by the term "ultimate nett loss," on account of personal injuries and/or property damage caused by or growing out of each occurrence arising

out of or due wholly or in part to the conduct of the Assured's business and/or act or omission of the Assured's agents and/or employees and/or contractors and/or subcontractors.

### 2. "Occurrence"

From 1955 through 1963, the excess policies that Wallis issued to PSC contained the following definition of occurrence:

> The term "occurrence" wherever used in this contract shall mean one happening or series of happenings arising out of or due to one event taking place during the term of this contract.

From 1964 though 1977, the excess policies that Wallis issued to PSC contained a different definition of occurrence:

> The term "occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which results in personal injury or property damage.

### 3. "Ultimate Nett Loss"

The policies define "ultimate nett loss" as the amount of damages the insured becomes liable for as a consequence of any occurrence covered under the policies.[10]

### 4. SIRs and Policy Limits

A typical PSC policy with Wallis reads as follows:

> Underwriters herein shall be liable for the ultimate nett loss in excess of $25,000 ultimate nett loss with a limit of $500,000 in all, in respect of each occurrence, it being understood, however, that the face value of this contract remains unaltered, and there

8. The total limits of liability for the highest layer of excess insurance issued to PSC by Wallis ranged from $4,000,000 in 1955 to $15,000,000 for the years from 1963 through 1977.

9. Because the policy language, the SIRs, and the policy limits changed over more than two decades of yearly policies that Wallis issued to PSC, we quote from typical policies and we note where important wording changed in particular years.

10. The policies specifically state as follows:
The term "ultimate nett loss" shall be understood to mean the sums for which the Assured actually

become liable for personal injury and property damage claims, including consequential damages, either through adjudication or compromise, after making proper deductions for all recoveries and salvages, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, interest, expenses for doctors, lawyers, nurses, investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Assured's permanent employees.

is no limit to the number of occurrences for which claims may be made hereunder *provided such occurrences occur during the term of this contract.* (Emphasis added.) In this example, taken from PSC's policy with Wallis for 1955, the SIR is $25,000, and the policy limit is $500,000.

## C. METHODS OF ALLOCATING LIABILITY ACROSS POLICY YEARS

PSC and Wallis presented opposing views as to the proper method for allocating liability among the multiple insurers and policies held by PSC for the contaminated sites. PSC argued that as the insured under these policies, PSC should be allowed to "pick and choose" a single policy from among the triggered policies under which PSC would receive full indemnification for the costs of remediating the sites. Wallis, on the other hand, argued that the trial court should apply a "time-on-the-risk" method of allocating liability among the insurers. Under this approach to allocation, where environmental pollution spans many years and many insurance policies, no single insurance policy is required to indemnify the entire cost of remediation. Rather, these costs are allocated among the policies according to their respective terms and limits.

PSC argued that in this case, PSC should be allowed to "pick and choose" which of multiple triggered policies is liable for the costs of remediation. According to this method of allocation, any single policy could be held liable for all of the costs incurred by PSC. In support of the "pick and choose" method of allocation, PSC emphasizes that each Wallis policy provides that Wallis will indemnify PSC for "any and all sums" that PSC is liable to pay as a result of property damage caused by an occurrence. PSC argues that "any and all sums" includes the full costs of remediation incurred as the result of an occurrence under a policy. Thus, PSC

argues that with respect to each site, any single triggered policy may be held liable for the entire cost of remediation of the environmental damage at that site. PSC also argues that because only one policy is triggered, PSC must exhaust only one SIR.

Wallis argues that the "pick and choose" method of allowing the insured to select a single policy to be held liable forces the insurer to pay for occurrences that take place outside the term of the insurance policy. Wallis emphasizes that many of its policies define an occurrence as a "series of happenings arising out of or due to one event *taking place during the term of this contract.*" (Emphasis added.) Wallis further notes that its policies containing pollution exclusion clauses only restore coverage when the pollution was caused by a "sudden, unintended and unexpected happening *during the period of this Insurance.*" (Emphasis added.) Because the insurance terms were limited to one year at a time, Wallis contends, it is inequitable to hold just one policy liable for harm that occurred over several decades.

According to the time-on-the-risk method of allocation urged by Wallis, the amount of ultimate nett loss for each site would be allocated across all years from the onset of environmental damage until its discovery by the insured. Once an amount of liability is determined for each year, the SIR for each policy-year would be deducted. Any remaining liability would be borne by Wallis up to its policy limit. Where both Wallis and another insurer have issued policies to PSC for the same layer of excess in the same year, they would bear the liability attributable to that layer of risk in proportion to the degree of risk that each insurer accepted.

## D. PROCEEDINGS BELOW

■ The trial court concluded that there was one continuous occurrence at each site, and therefore that each of the several policies held by PSC was triggered.[11] Wallis

11. Triggering occurs when a threshold event implicates an insurance policy's coverage. The fact that a policy has been triggered means that there may be liability coverage under that policy, subject to the policy's terms, the application of any exclusions in the policy, and any other defenses

the insurer may raise. Thus, a policy that has not been triggered does not provide any coverage, while a policy that has been triggered may or may not provide coverage, depending on the circumstances of the case.

filed a post-trial motion for allocation of judgment and set-off. Wallis stated that it was only seeking set-off as an alternative to a time-on-the-risk allocation, and Wallis conceded that if the court decided to follow time-on-the-risk allocation, it would be inequitable for the court also to grant Wallis a set-off. PSC conceded that it was responsible for one SIR for each of the two sites.

The trial court denied Wallis' request for time-on-the-risk allocation, and found Wallis liable for the entire amount of costs incurred by PSC. However, the trial court granted Wallis a set-off for the amounts that PSC received in settlements from the other excess insurers involved in this litigation.

The court of appeals held that the trial court correctly denied Wallis' post-trial motion for allocation:

> Each of the policies provides that Wallis will pay "any and all sums" caused by an occurrence during the policy period. Here, the trial court found, with record support, that because each of the policies in question was triggered, there was a single continuous "occurrence" at each site. When a single occurrence spans multiple policy periods, the "any and all sums" provision prohibits allocating damages to the

policyholder. *See TPLC, Inc. v. United National Insurance Co.*, 44 F.3d 1484 (10th Cir.1995).

*Wallis*, 955 P.2d at 572. The court of appeals further reasoned that "courts that have adopted this allocation method have done so primarily in order to allocate a judgment among several insurers, not necessarily to limit the insured's recovery." *Id.* The court of appeals stated that allocation in this case "is unnecessary and would lead to an inequitable result" and noted that "[b]ecause the court reduced the judgments against Wallis to account for PSC's settlements with other insurers, Wallis was further protected from bearing other insurers' liability for PSC's damages." *Id.*

The court of appeals also found that time-on-the-risk was improper in this case because the trial court instructed the jury on a "continuous trigger" theory for determining when an insurance policy is implicated.[12] The court of appeals decision relied in part on a Tenth Circuit case, *TPLC*, for the proposition that time-on-the-risk allocation is prohibited in a jurisdiction that applies a continuous trigger theory. *See Wallis*, 955 P.2d at 572 (citing *TPLC*, 44 F.3d 1484).[13] Applying *TPLC* to this case, the court of appeals found

---

**12.** In long-term environmental damage and other complex causation cases, courts have used various theories to determine when a policy has been triggered. These theories were initially developed in the context of personal injury claims stemming from exposure to asbestos, but they have also been applied in the context of environmental pollution. According to the exposure theory, "only insurers on the risk at the time of the initial exposure to an injury-producing event would be required to respond." *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1995 WL 654020, at *7 (Del.Sup.1995). Under the manifestation theory, "coverage is not triggered until the actual injury is manifested or becomes apparent." *Id.* According to the injury-in-fact theory, "coverage is activated when there is evidence of actual injury during the policy period, regardless of when exposure took place or when the injuries become manifest." *Id.* at *8. Finally, under the continuous trigger theory, "any policy on the risk during the entire injurious process, meaning during exposure, progression and manifestation, will be required to respond." *Id.*

Both commentators and courts have recognized that in the context of long-term and gradual environmental pollution, there may not be much of a distinction between the injury-in-fact trigger theory and the continuous trigger theory:

> As a practical matter, the injury-in-fact trigger may produce the same result as a continuous trigger if damage is deemed to occur from the time the property is first exposed to the hazardous substance to until the damage is discovered.

Irene A. Sullivan & Ann Bickford, *The Comprehensive General Liability Policy*, 602 PLI/Lit 29, at *87–96 (1999).

> Conceptually, the injury-in-fact trigger and the continuous trigger are on the same continuum and are complimentary, rather than mutually exclusive. Accordingly, courts have stated that "where injury-in-fact occurs continuously over a period covered by different insurers or policies, and actual apportionment of the injury is difficult or impossible to determine, the continuous injury trigger may be employed to equitably apportion liability among insurers."

*United States Gypsum Co. v. Admiral Ins. Co.*, 268 Ill.App.3d 598, 205 Ill.Dec. 619, 643 N.E.2d 1226, 1255–56 (1994) (quoting *Sentinel Ins. Co. v. First Ins. Co. of Hawai'i, Ltd.*, 76 Hawai'i 277, 875 P.2d 894, 917 (1994)).

**13.** We note that in *TPLC*, the Tenth Circuit was applying Pennsylvania law, not Colorado law. *See TPLC*, 44 F.3d at 1490–91.

that time-on-the-risk allocation is improper when a continuous trigger theory of coverage is applied.

## E. INTERPRETATION OF THE WALLIS POLICIES AND PROPER ALLOCATION OF LIABILITY

### 1) A Reasonable Interpretation of the Wallis Policies Does Not Preclude the Application of Time–On–The–Risk Allocation

The issue of how to allocate the liability of the various insurance policies in this case is largely dependent on the interpretation given to the policies themselves. In a case such as this, the issue of contract interpretation is particularly difficult. The provisions of the insurance policies do not neatly fit the complexities of the factual scenario presented by gradual and continuous environmental pollution that spans several decades and numerous policy periods. Both parties make colorable arguments concerning the policy provisions.

 PSC urges us to hold that the phrases limiting coverage to events happening during the term of the policy are ambiguous and therefore to be construed in favor of the insured. In order for a policy provision to be ambiguous, it must be reasonably susceptible to different interpretations. See Chacon, 788 P.2d at 750. Alternatively, if the various provisions conflict with each other, then we must construe the contract in a manner that protects the reasonable expectations of the insured at the time the insured purchased the policies. See State Farm Mut. Auto. Ins. Co. v. Nissen, 851 P.2d 165, 167–68 (Colo.1993).

 However, we are unable to pursue either of these avenues of interpretation because we find the construction of the policies urged by PSC to be unreasonable. We note that the continuous trigger theory is a legal fiction permitting the law to posit that many repeated small events occurring over a period of decades are actually only one ongoing occurrence. In cases where property damage is continuous and gradual and results from many events happening over a long period of time, it makes sense to adopt this legal fiction for the purposes of determining what policies have been triggered.

Here, the policies provide that Wallis will indemnify PSC for any and all sums that PSC shall become liable to pay on account of property damage "caused by or growing out of each occurrence." The policies further state, in the provisions setting forth the SIRs and policy limits, that "there is no limit to the number of occurrences for which claims may be made hereunder *provided such occurrences occur during the term of this contract.*" [14] (Emphasis added.)

Our construction of the policy provisions must be "fair, natural and reasonable rather than strained or strictly technical." *Johnson v. American Family Life Assurance Co. of Columbus,* 583 F.Supp. 1450, 1453 (D.Colo. 1984) (applying Colorado law). We do not believe that these policy provisions can reasonably be read to mean that one single-year policy out of dozens of triggered policies must indemnify the insured's liability for the total amount of pollution caused by events over a period of decades, including events that happened both before and after the policy period. *Cf. Chacon,* 788 P.2d at 750–752 (refusing to accept insured's interpretation of insurance contract which court had determined was unreasonable). As many courts have commented, the "pick-and-choose" method followed by the trial court creates a false equivalence between an insured who has purchased insurance coverage continuously for many years and an insured who has

---

14. We note that the Wallis policies for some years contain language providing additional support for our holding that the "pick-and-choose" method urged by PSC represents an unreasonable interpretation of some of the insurance contracts. For example, we note that the Wallis policies from 1955 through 1963 define an occurrence as "one happening or series of happenings arising out of or due to one event taking place during the term of this contract." (We recognize, however, that the definition of occurrence contained in the Wallis policies from 1964 through 1977 fails to include this time limitation, *see* section III(B)(2), *supra.*)

Similarly, the Wallis policies from 1971 through 1977 contain pollution exclusions that restore coverage when the pollution was caused by a "sudden, unintended and unexpected happening during the period of this Insurance."

purchased only one year of insurance coverage:

> Were we to adopt [the policyholder's] position on defense costs a manufacturer which had insurance coverage for only one year out of 20 would be entitled to a complete defense of all asbestos actions the same as a manufacturer which had coverage for 20 years out of 20. Neither logic nor precedent support such a result.

*Insurance Co. of N. Am. v. Forty–Eight Insulations, Inc.,* 633 F.2d 1212, 1225 (6th Cir.1980).[15] By contrast, time-on-the-risk allocation would treat these two hypothetical insureds differently, in accordance with the vastly different insurance protection they had purchased with their respective amounts of insurance premiums. Because the "pick and choose" method of allocation does not represent a reasonable interpretation of the policies, the provisions are not ambiguous. Thus, no ambiguity exists that requires this court to interpret the policies in PSC's favor.

In addition to arguing that the policy provisions are ambiguous, PSC argued that the "pick and choose" method of allocation is necessary to protect PSC's "reasonable expectations" under the policy. At the time PSC purchased each individual insurance policy, we doubt that PSC could have had a reasonable expectation that each single policy would indemnify PSC for liability related to property damage occurring due to events taking place years before and years after the term of each policy. *Cf.* Joren S. Bass, *The Montrose Decision and Long–Tail Environmental Liability: A New Approach to Allocating Risk Among Multiple Third–Party Insurers,* 5 Hastings W.-N.W. J. Envtl. L. & Pol'y 209, 228 (1999) (discussing allocation and reasonable expectations of insured and insurers). As discussed above, there is no logic to support the notion that one single insurance policy among 20 or 30 years worth of policies could be expected to be held liable for the entire time period. Nor is it reasonable to expect that a single-year policy would

be liable, for example, if the insured carried no insurance at all for the other years covered by the occurrence. Therefore, we are unpersuaded by the argument that PSC must prevail according to the principle that we should construe conflicting policy provisions in a manner that protects the insured's reasonable expectations at the time of purchase. *Cf. Nissen,* 851 P.2d at 167–68.

■ Thus, we hold that where property damage is gradual, long-term, and indivisible, the trial court should make a reasonable estimate of the portion of the "occurrence" that is fairly attributable to each year by dividing the total amount of liability by the number of years at issue. The trial court should then allocate liability accordingly to each policy-year, taking into account primary and excess coverage, SIRs, policy limits, and other insurance on the risk, as explained further in section III(F), *infra.*

> 2) *Time-on-the-risk Allocation Is Not Inconsistent with a Continuous Trigger Theory*

■ The court of appeals also found that time-on-the-risk was an improper method of allocation given the use of a continuous trigger theory to determine the implication of a policy. As noted in section III(C), *supra,* the court of appeals applied *TPLC* and found that time-on-the-risk allocation is improper when a continuous trigger theory of coverage is applied. We disagree with this reasoning.

Certainly, some courts have determined what method of allocation to apply based in part on the trigger theory followed. For example, in *Northern States Power Co. v. Fidelity & Casualty Co. of New York,* an environmental pollution case, the Supreme Court of Minnesota held that an injury-in-fact trigger theory was inconsistent with the "pick-and-choose" method of indemnification[16] but was consistent with allocation according to time-on-the-risk. *See* 523 N.W.2d at 662. However, several courts have also applied time-on-the-risk allocation in the con-

---

15. *See also Owens–Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 650 A.2d 974, 992–93 (1994); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 283 Ill.App.3d 630, 219 Ill.Dec. 62, 670 N.E.2d 740, 749 (1996).

16. In *Northern States Power,* the Supreme Court of Minnesota referred to the pick-and-choose method as the "all sums" method. *See Northern States Power,* 523 N.W.2d 657, 662 (1994).

text of allocating liability among policies that were triggered by a continuous trigger. *See E.I. du Pont de Nemours,* 1995 WL 654020, at \*\*15–16; *Outboard Marine,* 219 Ill.Dec. 62, 670 N.E.2d at 748–50; *Owens–Illinois,* 650 A.2d at 995. Thus, in our view, the use of a continuous trigger theory neither requires nor precludes the use of time-on-the-risk allocation.

## F. APPLICATION OF TIME–ON–THE–RISK ALLOCATION

■ Because this case will be retried, it is not our task to apply time-on-the-risk allocation to the jury verdict amounts in this case.[17] However, we present some general guidelines to follow, emphasizing that these are flexible standards that the trial court has the discretion to modify and adapt according to the circumstances of a particular case.[18]

■ In our view, the most equitable method of allocation is a system of time-on-the-risk that also takes into account the degree of the risk assumed. Thus, where damages are not reasonably divisible and

therefore cannot be precisely attributed to successive insurance policies, the total amount of damages should be divided by the total number of years to yield the amount of damage that is fairly attributable to each year. For example, if an insured's liability for a decade of pollution is one million dollars, then one tenth of the total liability, or $100,000, is fairly attributable to each policy-year.

■ Within each policy-year, the allocation of that $100,000 of liability depends on the structure of the insurance. Primary insurance, or alternatively, any SIRs, must first be exhausted. If liability remains after that, then policies in the first layer of excess for that year are required to respond, then policies in the second layer of excess, and so on.

■ Where there are two or more policies within the same layer of excess, then liability is apportioned according to the degree of risk assumed by each policy. Thus, suppose the insured in the above example has an SIR of $20,000 and then two excess

**17.** Applying the time-on-the-risk allocation method to the jury findings in this case yields the following results, which we present for illustration only, since this case will be remanded to the trial court for retrial:

With respect to the Barter site, the jury determined that PSC's ultimate nett loss was $5,650,-978.82. For the purposes of this example, we accept as true Wallis' assertion that first contamination occurred in 1955 and that PSC discovered the contamination in early 1990. Therefore, the amount of ultimate nett loss should be allocated across a period of 35 years, which results in a liability of $161,456.53 for each year. The jury found that for the Barter site, Wallis policies were triggered for 1955 through 1977. From 1955 through 1959, the Wallis policies were excess to PSC's SIR in the amount of $25,000. Deducting the SIR amount from the portion of the ultimate nett loss attributable to each year leaves Wallis with a liability of $136,456.53 for each of those five years. From 1960 through 1968, PSC had SIRs of $100,000, leaving Wallis with a liability of $61,456.53 for each of those nine years. In 1969, PSC had an SIR of $100,-000, and both Wallis and another insurance company had issued excess policies, with Wallis liable for 62.5% of the excess, or $38,410.33. In 1970, PSC had an SIR of $100,000 and Wallis was liable for 40% of the excess, or $24,582.61. From 1971 through 1975, PSC had an SIR of $100,000 per policy-year and Wallis was liable for 30% of the excess, or $18,436.96 for each of

those five years. In 1976, Wallis' policy was excess to another insurance company's policy with a limit of $500,000, so Wallis would not have any liability for that year. Similarly, Wallis would not have any liability for 1977, when PSC had an SIR of $500,000. The net result of this application of the time-on-the-risk method is that Wallis would only be liable for $1,390,569.16 of PSC's ultimate nett loss of $5,650,978.82 at the Barter site.

With respect to the Lowry site, the jury determined that PSC's ultimate nett loss was $1,457,-007.64. For the purposes of this example, we assume that the first contamination occurred in 1968 and that PSC discovered the contamination in 1985. Therefore, the ultimate nett loss should be allocated over a period of eighteen years, resulting in a liability of $80,944.87 for each year. Because PSC had SIRs of $100,000 for the years 1968 through 1985, these SIRS totally absorb the liability for each policy-year. Thus, according to this method, Wallis would not be liable for any of the ultimate nett loss of $1,457,-007.64 found by the jury.

**18.** We agree with the comments of the Supreme Court of Minnesota, which expressed its recognition "that damages are by nature fact-dependent and that trial courts must be given the flexibility to apportion them in a manner befitting each case." *Northern States Power,* 523 N.W.2d at 663.

insurance policies from different insurers in the first layer of excess. Each of these excess policies indemnifies the insured for losses in excess of $20,000 and up to a $50,-000 limit of total loss, with one insurer assuming 70% of the risk in that excess layer and the other insurer assuming 30% of the risk. Under these circumstances, the insured would absorb the first $20,000 of the total $100,000 of liability. Of the remaining $80,000, only $30,000 would be covered by the two insurers in this first layer of excess.[19] The insurer who had assumed 70% of the risk would pay $21,000, while the insurer who had assumed 30% of the risk would pay $9,000. The remaining $50,000 of liability would be allocated to the subsequent layers of excess, or would be absorbed by the insured if the insured was only insured up to a total loss of $50,000 for that year.

■ ■ By setting forth this example, we do not mean to imply that degree of risk should be taken into account when successive policies have different policy limits, as some courts have done. See, e.g., Owens–Illinois, 650 A.2d at 993–94. Rather, the amount of liability that is initially attributed to each year is independent of the policy limits that may be in place for any given year. Returning to our example, $100,000 of liability would be allocated to each policy-year, even if the insured had only obtained $50,000 worth of insurance coverage during certain years and $200,000 worth of coverage in other years. Once the policy limit is reached in any given year, the insured is required to absorb whatever remains in excess, in accordance with its business decision to purchase that particular amount of insurance.

PSC has conceded that it should be responsible for one SIR per occurrence per site. Because the trial court found that there was only one continuous occurrence at each site, PSC argues that it is therefore responsible for one SIR per site. Under the trial court's ruling allowing PSC to pick-and-choose the particular policy from which it

seeks indemnification, PSC would have the option of choosing a policy with the lowest SIR that it retained. However, the fiction in which we engage to find one continuous occurrence across the policy years is useful only for allocating liability — it does not negate the jury's determination that an occurrence took place at each site in each of the covered years, triggering each of the policies. Thus, because the terms of each specific Wallis policy require PSC to exhaust one SIR per occurrence and because the jury found an occurrence in each year, PSC must exhaust one SIR per site per year.

## G. NO SET-OFF WHERE THERE IS TIME-ON-THE-RISK ALLOCATION

Wallis has conceded that if liability is allocated according to the time-on-the-risk method, then it is not also entitled to a set-off for the amounts that PSC received in settlement agreements with its other insurers. We agree.

## IV. CONCLUSION

We reverse two of the holdings of the court of appeals concerning the London pollution exclusion clause. First, although we agree with the court of appeals that the term "sudden" is ambiguous and does not carry a temporal connotation, we hold that the trial court's instruction defining the phrase "sudden, unintended and unexpected" as "unexpected or unintended" was nonetheless erroneous. On remand, the jury should be instructed that "sudden, unintended and unexpected" means "unprepared for, unintended, and unexpected."

We also find the pollution exclusion ambiguous with respect to whose perspective is relevant, and therefore we construe it to mean "sudden, unintended and unexpected" from the standpoint of the insured. Thus, we reverse the holding of the court of ap-

19. According to our example, the insurers have indemnified the insured up to a certain total limit of liability that *includes* the SIR. Thus, the insurers in the first layer of excess in this example are required to indemnify the insured for the policy limit minus the insured's SIR, or $50,000 minus

$20,000. We have modeled this example after the wording of the Wallis policies, which requires Wallis to indemnify PSC "for the 'ultimate nett loss' in excess of [the SIR amount] of 'ultimate nett loss' with a limit of [the policy limit] in all." See section III(B)(4), supra.

peals that this phrase may mean "unintended and unexpected" from the standpoint of those in control of the contaminants.

We also reverse the court of appeals with respect to the trial court's denial of Wallis' post-trial motion for allocation. We hold that in cases of indivisible, long-term environmental pollution spanning many years and many successive insurance policies, liability should be allocated according to the time-on-the-risk method, taking into account the degree of risk assumed where appropriate and requiring the insured to be responsible for one SIR per policy-year where applicable. We return this case to the court of appeals with directions that it be remanded to the trial court for further proceedings consistent with this opinion.