PUBLIC SERVICE COMPANY OF COL-
ORADO, a Colorado corporation, Plain-
tiff–Appellee and Cross–Appellant,

v.

WALLIS AND COMPANIES, Defendant–
Appellant and Cross–Appellee.

No. 96CA0333.

Colorado Court of Appeals,
Div. IV.

July 10, 1997.

As Modified on Denial of Rehearing
Oct. 2, 1997.

Certiorari Granted May 26, 1998.

Slivka, Robinson, Waters & O'Dorisio, P.C., Richard P. Slivka, Denver, for Plaintiff–Appellee and Cross–Appellant.

Freeborn & Peters, Margaret S. Garvey, Marsha M. Piccone, Denver, for Plaintiff–Appellee and Cross–Appellant (on the Briefs).

Overton & Feeley, P.C., Robert W. Smith, Denver; William H. Remine, P.C., William H. Remine, Denver; Blatt, Hammesfahr & Eaton, Bruce M. Engel, David W. Alberts, Chicago, IL, for Defendant–Appellant and Cross–Appellee.

Opinion by Chief Judge STERNBERG.

Public Service Company of Colorado (PSC) sued Wallis and Companies (Wallis), representatives of certain underwriters at Lloyd's, London, and of other London market insurance companies, for the costs of environmental cleanup activities resulting from PSC's contamination of three sites. PSC prevailed in whole or in part on claims relating to two sites; Wallis on one. Both parties appeal. We affirm in part, reverse in part, and remand for a new trial.

### The Barter Yard

Barter Machinery & Supply Company was in the scrap metal business. From the late 1940's to 1985, PSC sold to Barter scrap electrical equipment which contained lead and polychlorinated biphenyls (PCBs). These substances contaminated the soil and groundwater at the scrap yard. When Barter notified PSC of the contamination, the two entities investigated the nature and scope of the contamination to determine the cost of remediation. Because Barter could not afford the cost of the cleanup, PSC agreed to fund the cleanup in exchange for title to the site, and cleanup activities began in 1992. PSC and the Environmental Protection Agency (EPA) agreed on the appropriate extent of the cleanup.

### The Lowry Landfill

Between 1966 and 1980, along with approximately 200 other industrial entities, PSC arranged for the disposal of industrial wastes at the Lowry Landfill. In 1984, EPA placed the landfill on its "Superfund" list pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601, et seq. (1994). EPA notified PSC that it was a "potentially responsible party" (PRP) in 1988. Ultimately, PSC entered into an agreement with Waste Management, Inc., under which PSC paid a certain sum in exchange for full indemnification for its liability at Lowry.

### The Pueblo Gas Plant

From 1881 to 1928, PSC's predecessors operated a manufactured gas plant in downtown Pueblo. One of the by-products of the manufacturing process was coal tar, which was stored in underground wells for later resale. When PSC took over the site in the 1950's, it was unaware of the history of the site or the possibility of environmental contamination. In 1989, when PSC was landscaping the property, it discovered the underground wells and began an investigation into the contamination. The investigation revealed that the contaminated groundwater was migrating off site, and PSC subsequently ordered the cleanup of the site.

### The Lawsuits

In 1992, PSC filed three separate lawsuits (one for each site) against its various insurers, seeking declaratory judgments on PSC's rights under the insurance contracts and damages for alleged breaches of those contracts. All of the insurer groups except Wallis settled with PSC before trial.

The suits against Wallis were consolidated for trial, and the jury returned verdicts in favor of PSC and against Wallis for the costs incurred at the Barter and Lowry sites. However, the jury ruled in favor of Wallis on the Pueblo claim, concluding that PSC had failed to give timely notice of its claim.

### I. Legal Liability

Wallis first argues that PSC was not "legally liable" within the meaning of that phrase in the insurance policies for the cost of the environmental cleanup at the Barter site and that, therefore, its costs there were not covered by the insurance policies. We disagree.

### A. "Legal Liability" Defined

█ The policies at issue here provide that the insurers will "indemnify [PSC] for any and all sums which they . . . shall be legally liable to pay . . . as more fully defined by the term 'ultimate nett loss'. . . ." The trial court instructed the jury that PSC was "legally liable" for the costs of cleanup at the individual sites if it was required to engage in such cleanup activities by law, and further that: "It is not necessary that anyone actually commenced a lawsuit to compel Public Service to clean up [the sites]; it is sufficient that a statute or regulation imposes responsibility upon Public Service for such a cleanup." The court also instructed the jury that PSC was "legally liable for all of the costs of cleaning up the contamination at the Lowry Site and Barter Site under applicable federal environmental laws."

Cleanup of much environmental contamination is governed by CERCLA. Wallis argues that, because the EPA did not designate the Barter site as a CERCLA site, and because the EPA did not take action to subject the site to CERCLA cleanup requirements, PSC had no "legal liability" for the cleanup, and its voluntary activities should not be covered by the policies.

However, the policies do not contain any requirement that an environmental enforcement action be filed before coverage is triggered. If the insurers had intended to provide coverage only when an enforcement action or lawsuit was brought, such a requirement could have been included in the policy language. We decline to add language to the insurance contract that was not part of the agreement between the parties. See *Weyerhaeuser Co. v. Aetna Casualty & Surety Co.*, 123 Wash.2d 891, 874 P.2d 142, 154 (1994) (addressing a similar "voluntary payment" argument, the court stated: "In the case where there has been property damage and where a policyholder is liable pursuant to an environmental statute, a reasonable reading of the policy language is that coverage is available, if it is not otherwise excluded.").

In rejecting similar defenses to that advanced by Wallis, other courts have referred to the congressional purpose of encouraging private party environmental cleanup. See *Maryland Casualty Co. v. Wausau Chemical Corp.*, 809 F.Supp. 680, 696 (W.D.Wis.1992):

The legislative history of CERCLA provides evidence that the stiff penalties for failure to negotiate with EPA were intended to make the primary force behind cleanup efforts voluntary settlements, rather than drawn-out litigation. See H.R.Rep.

No. 253, 99th Cong., 2d Sess., pt. 1 at 101 (1985), U.S.Code Cong. & Admin. News 1986, 2835, 2883 ('negotiated private party actions are essential to an effective program for cleanup of the nation's hazardous waste sites and it is the intent of this Committee to encourage private party cleanup at all sites'). To hold that such settlements are 'voluntary' for purposes of an insurance policy exclusion would frustrate the intent of Congress.

As noted in *Compass Insurance Co. v. Cravens, Dargan & Co.*, 748 P.2d 724 (Wyo. 1988), the fact that the insured commenced cleanup efforts before formal claims were filed is a credit to the insured, not an excuse for the insurer to deny coverage.

### B. Liability under CERCLA

Wallis argues further, without supporting citation, that the court's instruction on joint and several liability under CERCLA was erroneous as a matter of law. We perceive no error.

■ CERCLA imposes joint and several liability on potentially responsible parties regardless of fault. 42 U.S.C. § 9607 (1994); *County Line Investment Co. v. Tinney*, 933 F.2d 1508 (10th Cir.1991); *Hecla Mining Co. v. New Hampshire Insurance Co.*, 811 P.2d 1083 (Colo.1991).

Although 42 U.S.C. § 9613 (1994) authorizes responsible parties to bring contribution actions against one another, courts have been reluctant to apportion costs between potentially responsible parties, and have done so only when a party can demonstrate that the harm is divisible. *See United States v. Colorado & Eastern R.R. Co.*, 50 F.3d 1530 (10th Cir.1995); *County Line Investment Co. v. Tinney, supra; O'Neil v. Picillo*, 883 F.2d 176 (1st Cir.1989). Here, the court correctly instructed the jury on joint and several liability under CERCLA.

### II. The Pollution Exclusion to the Insurance Policies

### A. Burden of Proof

■ Wallis asserts that the "pollution exclusion" clause contained in the policies in effect between 1971 and 1977 precludes PSC from recovering on its claims, and that the trial court improperly instructed the jury as to the burden of proof on the applicability of the exclusion. Specifically, Wallis argues that it was PSC's burden to prove that the "sudden, unintended, and unexpected" exception to the exclusion applied. We agree that the trial court incorrectly shifted the burden of proof.

The clause at issue here, entitled "Industries, Seepage, Pollution and Contamination Clause No. 3," reads as follows:

This Insurance does not cover any liability for:

. . . .

(2) The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances unless the seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance.

■ Generally, in disputes over insurance coverage, the insurer bears the burden of proving the applicability of any exclusion from coverage. The burden then shifts back to the insured to prove the applicability of an exception to the exclusion. *Rodriguez v. Safeco Insurance Co.*, 821 P.2d 849 (Colo. App.1991).

The trial court here rejected Wallis' tendered jury instruction shifting the burden to PSC. Instead, over Wallis' objections, the court instructed the jury that Wallis had the burden of establishing first that the property damage resulted from contamination and, second, that the contamination was not sudden, unintended, and unexpected.

Citing *Hecla Mining Co. v. New Hampshire Insurance Co., supra*, PSC argues that, when the exclusionary language is ambiguous, the burden remains with the defendant to establish the applicability of the exclusion. *Hecla*, however, concerned an insurer's duty to defend, a duty that is broader than the duty to indemnify. The *Hecla* court simply held that when an insured's allegations state a claim that is potentially or arguably within the policy coverage, the insurer is obligated

to defend an insured being sued by a third party.

There is a division of authority throughout the nation on the issue of whether the insured or the insurer bears the burden of proving an exception to an exclusion. *Compare Rodriguez v. Safeco Insurance Co., supra, with Remington Arms Co. v. Liberty Mutual Insurance Co.,* 810 F.Supp. 1406 (D.Del.1992).

In our view, under Colorado law, the court improperly imposed the burden on Wallis to establish the inapplicability of the exception to the exclusion. *See Rodriguez v. Safeco Insurance Co., supra; Watkins v. Security Benefit Ass'n,* 81 Colo. 66, 255 P. 452 (1927).

■ The proper allocation of the burden of proof is a substantial right of the parties, and allocating the burden of proof to the wrong party constitutes reversible error. *Atlantic & Pacific Insurance Co. v. Barnes,* 666 P.2d 163 (Colo.App.1983). PSC should have had the burden of proving that the happening that caused the contamination was sudden, unintended, and unexpected.

■ We reject PSC's argument that any error in imposing the burden on Wallis was harmless because the jury answered a special interrogatory that PSC did not expect or intend the release of contamination or pollution into the environment at either Barter or Lowry during the years in question. The answer to the interrogatory was given under the improper instruction on the burden of proof.

Therefore, Wallis is entitled to a new trial on the applicability of the pollution exclusion clause during the years it was included in the policy. On retrial, the fact finder must determine whether the exclusion is applicable for those years and, if the exclusion is applicable, redetermine the total amount of damages incurred for each site.

### B. "Sudden, Unintended and Unexpected"

Because the issue is likely to arise on retrial, we address Wallis' contention that the trial court erred in interpreting the "sudden, unintended, and unexpected" language in the policies' pollution exclusion clause.

### 1. Ambiguous Language

■ Following the holding in *Hecla Mining Co. v. New Hampshire Insurance Co., supra,* the trial court instructed the jury:

> The phrase 'sudden, unintended and unexpected' is ambiguous because it is susceptible to more than one reasonable interpretation. You are instructed that, in this case, the phrase 'sudden, unexpected and unintended' as used in this exclusion means 'unexpected or unintended' from the standpoint of Public Service.

In *Hecla,* the court refused to attach a solely temporal connotation to the word "sudden" because it would result in an inherent contradiction to specific policy language defining an occurrence as "continuous or repeated exposure." Here, in contrast, there is no such inherent contradiction, but because the phrase is subject to more than one interpretation and is not further defined in the policy, it must be construed in favor of the insured and against the insurer who drafted the contract. *Hecla Mining Co. v. New Hampshire Insurance Co., supra.*

### 2. Focus of the Inquiry

Nevertheless, we agree with Wallis that the trial court's instruction erroneously focused the jurors' attention on whether PSC expected or intended the *pollution* rather than the *happenings* that caused the pollution.

■ When there are two or more reasonable interpretations of a clause in an insurance policy, the court must adopt an interpretation that provides for coverage. *Chacon v. American Family Mutual Insurance Co.,* 788 P.2d 748 (Colo.1990). However, the rule that "contracts of insurance are to be strictly construed in favor of the insured ... applies only when there is, in fact, a need to construe the contract." 2 G. Couch, *Cyclopedia of Insurance Law* § 21.11 at 21–19 (L. Russ ed. 1995). Hence, while ambiguous language must be construed in favor of the insured and against the insurer who drafted the policy, *see Hecla Mining Co. v. New Hampshire Insurance Co., supra,* "courts will not force an ambiguity in order

to resolve it against an insurer." *Martinez v. Hawkeye–Security Insurance Co.,* 195 Colo. 184, 188, 576 P.2d 1017, 1019 (1978).

The proper focus of the inquiry here, according to the plain language of the policy, is whether the happenings resulting in the discharge of contaminants were unintended or unexpected. Whether PSC or its predecessors intended the contamination that resulted from those happenings is not relevant for purposes of this analysis. *See Hecla Mining Co. v. New Hampshire Insurance Co., supra; Broderick Investment Co. v. Hartford Accident & Indemnity Co.,* 954 F.2d 601 (10th Cir.1992) (applying Colorado law).

■ Furthermore, whether PSC expected or intended the contamination is not relevant; the proper inquiry is whether those in control of the contaminants expected or intended the actions which resulted in contamination.

PSC argues that policy language was ambiguous on this point, and so should be construed in favor of coverage. Again, because in our view the policy language was unambiguous, the rubric requiring interpretation in favor of coverage is inapplicable. *See Hecla Mining Co. v. New Hampshire Ins. Co., supra.*

The purpose of the "unintended and unexpected" language is to provide insurance coverage in the event of an accident, not in the event of simple ignorance about the consequences of known activity. Thus, on retrial, the jury should be instructed that if Wallis meets its burden of establishing the applicability of the pollution exclusion, PSC can prevail only if it establishes that the contamination was the result of an unintended and unexpected happening (from the standpoint of those in control of the contaminants) during those policy periods.

### III. The Notice Issues

#### A. Burden on "Notice"

As to another issue that will arise on retrial, Wallis also contends that the trial court erred in instructing the jury that it had the burden of proving its affirmative defense that PSC failed to provide timely notice of its claims. The notice provision, Wallis asserts,

is a condition precedent to coverage, and therefore, PSC had the burden of establishing timely notice. We reject this contention.

■ If an insurance contract specifies a condition precedent to coverage, the insured must establish that that condition has been met to recover its damages. *Ewing v. Colorado Farm Mutual Casualty Co.,* 133 Colo. 447, 296 P.2d 1040 (1956).

■ Although a notice requirement may be expressly made a condition precedent to an insurer's liability, a provision for notice will not be construed as a condition precedent unless that intention is clearly and unequivocally stated in the contract. *Balzano v. Bluewater Insurance Ltd.,* 801 P.2d 1 (Colo.App.1990), *aff'd,* 823 P.2d 1365 (Colo. 1992).

■ Here, the trial court instructed the jury that if Wallis proved that PSC failed to provide timely notice within a reasonable time, PSC would have the burden of establishing that it had some reasonable justification for delaying such notice.

The notice provision in the policies required that the insured notify the insurers "as soon as practicable" of any occurrence likely to involve the policy, "provided, however, that failure to notify [the insurer] of any occurrence which at the time of its happening did not appear to involve this contract, but which at a later date would appear to give rise to claims hereunder, shall not prejudice such claims." The policies contained no language indicating that the notice provision was a condition precedent to coverage. Instead, we view the provision here as a limitation on coverage and, therefore, hold that the court properly imposed on Wallis the burden of establishing any failure of timely notice.

#### B. Notice of the Pueblo Claim

PSC cross-appeals on the Pueblo claim, contending that the trial court erred in failing to instruct the jury on the applicability of the "notice-prejudice" rule, and that Wallis waived its right to assert a late notice defense. We are not persuaded.

### 1. The Notice–Prejudice Rule

According to PSC, the trial court should have instructed the jury on the applicability of the "notice-prejudice" rule. Wallis counters that, since the notice-prejudice rule has been rejected by Colorado courts, there was no error. We agree with Wallis.

■ Under the "notice-prejudice" rule, an insurer cannot deny coverage on the ground that a notice requirement has not been met unless the insurer can show that it was prejudiced by the act of the insured. *See Jones v. Bituminous Casualty Corp.*, 821 S.W.2d 798 (Ky.1991). However, Colorado courts have refused to adopt the notice-prejudice requirement and have adhered to the traditional rule that unexcused delay in giving notice relieves the insurer of its policy obligations without regard to prejudice. *See Marez v. Dairyland Insurance Co.*, 638 P.2d 286 (Colo.1981); *Graton v. United Security Insurance Co.*, 740 P.2d 533 (Colo.App.1987).

Citing a majority of jurisdictions that have considered insurance coverage claims for environmental contamination and applied the notice-prejudice rule, PSC urges us to adopt that rule specifically for cases involving environmental contamination. We decline to do so.

It is true that in cases such as this, the occurrence giving rise to damages is often undetected for years or even, as here, decades. However, we need not distinguish environmental contamination cases from others by establishing a new legal rule. The language of the policy requires that the insured give notice "as soon as practicable" or provide reasonable justification, and the resolution of that factual issue is left to the fact finder. Thus, the court properly rejected PSC's tendered instruction on the notice-prejudice rule.

### 2. Waiver of Late Notice Defense

PSC also asserts that, because late notice was not raised as a defense when Wallis denied coverage on the Pueblo site, Wallis waived its right to assert a late notice defense at trial. Therefore, PSC argues, the trial court erred in not granting its motion for judgment notwithstanding the verdict. We perceive no error.

■ Generally, an insurer must raise (or at least reserve) all defenses to coverage within a reasonable time after learning of such defenses. When an insurer denies coverage on specific grounds it waives the right later to assert additional defenses to coverage, including lack of timely notice. *Flatiron Paving Co. v. Great Southwest Fire Insurance Co.*, 812 P.2d 668 (Colo.App.1990). However, the failure to raise a late notice defense in a preliminary letter does not, without more, constitute a waiver of that defense. *Haller v. Hawkeye–Security Insurance Co.*, 936 P.2d 601 (Colo.App.1997).

■ Here, PSC notified Wallis of its Pueblo claim in March 1992. PSC's letter outlined the scope of the environmental contamination and the cleanup efforts, but did not specify the dates during which the contamination was discovered and remediated. Wallis promptly issued a reservation-of-rights letter in response to PSC's initial notification of the claim, raising eight affirmative defenses to coverage, but not asserting the defense of late notice. However, Wallis did state in the letter that "the available information does not provide sufficient facts to determine the appropriate date of loss for this matter," and explicitly reserved the right to supplement its grounds for denial of coverage. In November 1992, for the first time, PSC notified Wallis of the dates of the cleanup activities, and PSC initiated this declaratory judgment action shortly thereafter. Under these circumstances, we hold that the late notice defense was not waived.

### IV. The Judgment against Wallis

Wallis next argues that the trial court erred in entering its final judgment on the Barter and Lowry sites. Specifically, Wallis asserts that the judgment should have been entered severally, rather than jointly and severally, and that the judgment should have been allocated across all the years in which the environmental contamination occurred. If a retrial results in judgment against Wallis, these issues are likely to arise again, so we address them here.

### A. Joint and Several Liability

■ In arguing that any liability of the individual underwriters is several, Wallis relies on the standard language of the Lloyd's of London insurance policies in which each subscribing underwriter ("name") agrees to assume a specified portion of the risk, "each for his own part and not one for another." Under the policy language, unique to the London insurance market, each underwriter is liable only for the percentage of the risk for which it has agreed to be responsible. *See Chase Manhattan Bank, N.A. v. Aldridge,* 906 F.Supp. 870 (S.D.N.Y.1995).

PSC's ability to collect a judgment under this scheme is protected. Before the trial court was a Lloyd's publication containing this language describing the claims payment process:

> Lloyd's central accounting system ensures that, once agreed, a valid claim is paid directly to a broker's account and the account of the underwriting syndicate concerned is duly debited. *In the unlikely event that funds prove inadequate to meet the claim, payment to the policyholder is not affected.* (emphasis added)

Therefore, if retrial results in judgment against Wallis, the judgment should be entered severally.

### B. Allocation of the Judgment

■ Wallis also contends that the trial court erred in denying its post-trial motion to allocate the damages across all the years in which the contamination occurred at each site, and among PSC and its various other insurers. Wallis argues that adoption of a "time-on-the-risk" method to allocate the damages would prevent it from unfairly being held liable for coverage for damages suffered during periods when it did not insure the risk at each site. We are not persuaded.

Each of the policies provides that Wallis will pay "any and all sums" caused by an occurrence during the policy period. Here, the trial court found, with record support, that because each of the policies in question was triggered, there was a single continuous "occurrence" at each site. When a single occurrence spans multiple policy periods, the "any and all sums" provision prohibits allocating damages to the policyholder. *See TPLC, Inc. v. United National Insurance Co.,* 44 F.3d 1484 (10th Cir.1995).

Because no method exists for determining the precise amount of property damage that occurred in a given year, Wallis urges that we adopt the pro rata "time on the risk" approach used in some other jurisdictions. *See Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 283 Ill.App.3d 630, 219 Ill.Dec. 62, 670 N.E.2d 740 (1996). Under this approach, the amount of damages is allocated among insurers based upon the degree of the risk assumed during the years of each triggered policy, *i.e.,* proration on the basis of policy limits, multiplied by years of coverage. *See, e.g., Owens–Illinois, Inc. v. United Insurance Co.,* 138 N.J. 437, 650 A.2d 974 (1994).

Although Colorado courts have not addressed this issue, we note that courts that have adopted this allocation method have done so primarily in order to allocate a judgment among several insurers, not necessarily to limit the insured's recovery. *See, e.g., J.H. France Refractories Co. v. Allstate Insurance Co.,* 534 Pa. 29, 626 A.2d 502 (1993); *but cf. Outboard Marine Corp. v. Liberty Mutual Insurance Co., supra* (policyholder included in allocation scheme for years in which it elected not to carry insurance coverage).

We agree with the trial court that applying the approach of the court in *Outboard* to these facts is unnecessary and would lead to an inequitable result.

■ Because the court reduced the judgments against Wallis to account for PSC's settlements with other insurers, Wallis was further protected from bearing other insurers' liability for PSC's damages. For these reasons, we hold that if, as here, the judgment need not be allocated among more than one insurer, "time-on-the-risk" allocation is not appropriate.

### V. Award of Costs to PSC

### A. Jury Deductions from "Ultimate Nett Loss"

■ As a final issue that may arise on retrial, PSC argues that it should have been

awarded *all* damages it incurred at the Barter site, without the jury's deductions for the purchase price of the property, for "anticipated future costs," and for "excess cleanup" costs. The jury's decision, argues PSC, was contrary to the instructions given it by the court. We disagree.

The policy language specified that Wallis would indemnify PSC for damages defined as "ultimate nett loss," specifically "the sums for which the Assureds *actually* become liable...." The court instructed the jury that if Wallis breached its duty under the contracts, the award to PSC should reflect the amount of damages incurred as a result of that breach. The court also instructed the jury as to what costs were properly considered as part of "ultimate nett loss." The jury followed those instructions, and reasonably concluded that some of the enumerated costs were not properly considered as part of PSC's "ultimate nett loss."

### B.  PSC's Settlement Costs

■ We do agree with PSC's argument that the trial court erred in setting off the entire amount of PSC's settlements with its other insurers, without deducting PSC's costs and attorney fees incurred in obtaining those settlements.

Under the "common fund" doctrine, "those who share in the benefit of litigation should also share its costs." *Castellari v. Partners Health Plan of Colorado, Inc.*, 860 P.2d 593, 595 (Colo.App.1993). Colorado courts have applied this doctrine to require insurers to pay a proportionate share of attorney fees and costs incurred in obtaining settlements with other liable parties. *See County Workers Compensation Pool v. Davis*, 817 P.2d 521 (Colo.1991); *Drake v. Insurance Co. of North America*, 736 P.2d 1244 (Colo.App. 1986).

Wallis argues that attorney fees incurred by an insured are not recoverable in a contract action against the insurer. Here, however, PSC did not seek to recover the attorney fees it incurred in bringing this action. PSC sought only that the offset credited to the judgment against Wallis be reduced by the fees incurred in obtaining the settlements with the other insurers.

In the event that retrial results in a judgment against Wallis, Wallis is entitled to a setoff for the settlements PSC obtained, less PSC's attorney fees and costs incurred in obtaining those settlements.

The judgment is affirmed as to the Pueblo Gas Plant Claim; it is reversed as to the remaining claims, and the cause is remanded for a new trial consistent with this opinion.

JONES and ROY, JJ., concur.