## SCOTT'S LIQUID GOLD–INC., a Colorado corporation, Plaintiff,

v.

## LEXINGTON INSURANCE COMPANY, a Massachusetts corporation, Defendant.

### No. CIV.A. 97–B–107.

United States District Court, D. Colorado.

May 30, 2000.

    Q: Okay.

    Steven W. Black, Wiley E. Mayne, Holland & Hart LLP, Denver, CO, for Plaintiff.

Chris A. Mattison, Laura B. Alms, Hall & Evans, L.L.C., Denver, CO, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

BABCOCK, District Judge.

In this diversity breach of contract action, Plaintiff Scott's Liquid Gold (Scott's) seeks indemnification from Defendant Lexington Insurance Company (Lexington) for claims brought against Scott's in previous litigation by the United States Army and the South Adams County Water and Sanitation District (SACWSD) concerning groundwater contamination at the Rocky Mountain Arsenal. After consideration of the stipulated facts, evidence, trial briefs, and applicable law, I enter the following findings of facts and conclusions of law.

### I.

#### A. Background

The following facts are undisputed. On September 8, 1994, the United States filed a complaint against Scott's seeking costs incurred by the United States Army in connection with the environmental cleanup of the Rocky Mountain Arsenal (Arsenal) and the Klein Water Treatment Facility constructed for SACWSD. The Environmental Protection Agency had discovered the presence of volatile organic compounds in SACWSD's drinking water wells and sought payment of the environmental response costs from the U.S. Army. The Army paid over $25 million to investigate and remediate the groundwater contamination including the installation of a water treatment plant and future costs for operating and maintaining the treatment plant to clean the groundwater before it enters the SACWSD water wells.

During the Army's investigation of the groundwater contamination, it discovered the presence of solvents and other contaminants including 1,1,1–tricholoroethane (TCA) and its breakdown product dicholoroethence in the groundwater upgrandient from the Arsenal, under the Arsenal, and at a point where SACWSD had installed drinking water wells.

From approximately 1955 through 1991, Scott's manufactured wood cleaners and preservatives, an ingredient of which included TCA. Beginning in 1970, these items were manufactured at Scott's present facility near the Arsenal. TCA and other chemicals were stored in underground tanks located at Scott's facility. In 1972, a 30,000 gallon tank was installed on the south portion of Scott's facility and used exclusively for TCA storage. The tank was connected to a pipeline system that transported TCA to the manufacturing area.

According to Scott's, it was "exceptionally careful with the storage, use, and disposal of TCA and never intentionally released, dumped, or discharged TCA into the environment." Pltf. Ex. 3, Goldstein Aff., ¶¶ 4, 6–8, 10. Despite Scott's precautions, it is undisputed that the soil and groundwater beneath Scott's facility were contaminated by Scott's production activities.

The contaminated groundwater beneath Scott's facility flows toward the north northwest in the direction of the Arsenal, the SACWSD wells and the Klein water treatment facility. Folkes Aff. ¶ 6; Chirlin Aff. ¶ 5. A plume of contaminated water containing TCA and its breakdown products originating at Scott's facility has been moving toward the Arsenal and the SACWSD wells since 1976 and continues to the present time. Folkes Aff. ¶¶ 5–6; Chirlin Aff. ¶ 6. Two hydrogeologists agree that contamination seeped into the soil, migrated into the groundwater, and began flowing from Scott's facility toward the Arsenal and the SACWSD wells before 1980. Chirlin Aff. ¶ 6; Folkes Aff. ¶ 5. Both experts agree that eventually the contaminated plume will arrive at the SACWSD wells. Chirlin Aff. ¶ 6; Folkes Aff. ¶¶ 6, 8.

Scott's purchased Lexington umbrella policy number 5101186 for $10 million for the term 12/01/80 to 12/01/81. C/O Appendix C. After the Army sued Scott's for contribution, Scott's agreed to pay the Army $6 million in settlement. Mayne Aff. ¶ 8. Scott's also agreed to pay $200,000 to SACWSD. Scott's notified Lexington and its other insurers of the lawsuit and settlements. Lexington refused to indemnify Scott's and this action followed.

**B. Procedural History**

In 1998, the parties filed cross-summary judgment motions pursuant to Fed. R.Civ.P. 56. In a May 27, 1998 Order, I denied Lexington's summary judgment motion, granted Scott's partial summary judgment motion as to Claim Three for declaratory judgment and as to liability for Claim One for breach of contract. Further, I issued a declaration that Lexington had a duty to indemnify Scott's against all liability, loss, and expense it has incurred in connection with the U.S. Army's claims and any claims asserted by SACWSD, in an amount to be determined, up to the limits of liability set forth in the Lexington excess insurance policy. *See* May 27, 1998 Order, p. 13.

On July 2, 1998, the parties stipulated that Scott's damages totaled $1,294,470, as of June 14, 1998, excluding interest. *See* July 2, 1998 Stipulations; Attachment 1. As part of the Stipulation, Lexington reserved its right to challenge the categories of damages sought by Scott's.

**II.**

Pursuant to the parties' agreement, the scheduled trial was vacated and the following remaining damages issues were submitted on the briefs for my determination:

1. the amount of Scott's unreimbursed settlement payments, plus interest, allocable to Lexington;

2. the amount of unreimbursed defense costs, plus interest, incurred by Scott's in the underlying litigation with the Army allocable to Lexington;

3. the amount of attorneys' fees and costs incurred by Scott's to establish a covered occurrence allocable to Lexington;

4. the amount of attorneys' fees and costs incurred by Scott's in bringing the declaratory action and breach of contract claims in this action allocable to Lexington; and

5. the date from which pre-judgment interest accrues.

*See id.* In determining these damages issues in this diversity action, I apply Colorado state law. *See Permian Corp. v. Armco Steel Corp.,* 508 F.2d 68, 74 (10th Cir.1974).

A. Determination of the amount of Scott's unreimbursed settlement payments, allocable to Lexington

In *Public Service Co. of Colorado v. Wallis and Cos.,* 955 P.2d 564 (Colo.App.1997)(*Wallis I*), the Colorado Court of Appeals addressed the allocation of liability among multiple insurance policies. Public Service Company (PSC) sued Wallis, representatives of Lloyd's of London and other London market insurance companies, for the costs of environmental cleanup activities resulting from PSC's contamination of two sites from 1955 through 1977. Wallis had issued excess insurance polices to PSC from 1955 through 1977. From 1969 through 1985, PSC was also covered by excess insurance policies issued by other insurance companies. PSC filed suit against the insurance companies seeking indemnification for its expenses incurred with respect to these sites. All of the insurers except Wallis settled with PSC before trial. At trial, the jury found Wallis liable for $1,457,000.

Wallis filed a post-trial motion for determination of judgment allocation and set-off seeking allocation of the judgment on a *pro rata* "time-on-the-risk" basis. Based on policy provisions that "any and all sums" arising from an occurrence are covered, the trial court ruled that PSC was entitled to obtain indemnification from Wallis for the entire amount of its "ultimate net loss" under any policy triggered. *See Wallis I,* 955 P.2d at 572. However, the trial court granted Wallis a set-off for

the amounts that PSC received from the insurance companies that had settled with PSC earlier in the litigation. *Id.* On appeal, the Colorado Court of Appeals affirmed the "any and all sums" approach adopted by the trial court. *See id.*

As to payment of the attorney fees and costs incurred by Public Service in obtaining the settlements, the Court of Appeals stated:

We do agree with PSC's argument that the trial court erred in setting off the entire amount of PSC's settlements with its other insurers, without deducting PSC's costs and attorney fees incurred in obtaining those settlements.

Under the "common fund" doctrine, "those who share in the benefit of litigation should also share its costs." *Castellari v. Partners Health Plan of Colorado, Inc.,* 860 P.2d 593, 595 (Colo.App. 1993). Colorado courts have applied this doctrine to require insurers to pay a proportionate share of attorney fees and costs incurred in obtaining settlements with other liable parties. *See County Workers Compensation Pool v. Davis,* 817 P.2d 521 (Colo.1991); *Drake v. Insurance Co. of North America,* 736 P.2d 1244 (Colo.App.1986).

*Id.* at 574. The Court then ruled that Wallis was entitled to a setoff for the settlements PSC obtained, less PSC's attorney fees and costs incurred in obtaining those settlements.

In *Public Service Co. of Colorado v. Wallis and Cos.,* 986 P.2d 924 (Colo. 1999) (*Wallis II*), after a thorough analysis of the history of environmental damage insurance coverage, the Colorado Supreme Court rejected the "any and all sums" method espoused by *Wallis I* and adopted a "time on the risk" approach:

[w]here property damage is gradual, long-term, and indivisible, the trial court should make a reasonable estimate of the portion of the "occurrence" that is fairly attributable to each year by dividing the total amount of liability by the

number of years at issue. The trial court should then allocate liability accordingly to each policy year, taking into account primary and excess coverage, self-insured retention amounts (SIRs), policy limits, and other insurance on the risk. . . .

*Wallis II*, 986 P.2d at 940. Under this allocation method, there is no set-off for the amounts received in settlement agreements with other insurers. *Id.* at 942. *Wallis II* remains the law of Colorado. Thus, I am bound to apply it. *See Permian Corp. v. Armco Steel Corp.*, 508 F.2d 68, 74 (10th Cir.1974).

■ It is undisputed that the property damage in this case is "gradual, long-term, and indivisible." *See Wallis II*, 986 P.2d at 940. Thus, I employ the "time on the risk" method described in *Wallis II*. Under this method, the liability portion is arrived at by "dividing the total amount of liability by the number of years at issue." The insurer is then obligated to pay its share of the liability allocable to each of its policy years, taking into account primary and excess coverage, policy limits, policy deductibles, and other insurance on the risk. *Id.*

1. **Calculation of Lexington's share of Scott's unreimbursed liability**

a. **Total amount of liability (Numerator)**

The parties agree that Scott's paid the following settlement amounts:

| | |
|---|---:|
| Army Settlement | $6,000,000 |
| SACWSD Settlement | 200,000 |
| Interest on Note | 112,286 |
| **TOTAL** | **$6,312,286** |

b. **Number of years at issue**

In addition, the parties agree that the evidence establishes 1976 as the year the ground contamination began. The parties dispute, however, the year in which the contamination was discovered.

Pursuant to *Wallis II*, Lexington filed a motion for clarification of my May 27, 1998 Order addressing summary judgment motions. On March 1, 2000, I granted the motion for clarification to the extent that I held, *inter alia*, that the trier of fact must determine whether the contamination was discovered in 1988 or 1989. March 1, 2000 Order.

On March 17, 2000, a scheduling order entered stating, in pertinent part:

Pursuant to the Court's March 1, 2000 Order, the calculation of damages shall be allocated according to time on the risk pursuant to *Public Service Co. v. Wallis & Cos.*, 986 P.2d 924(Colo.1999), and shall accordingly be allocated across the period from 1976 to and including 1989.

March 17, 2000 Scheduling Order, p. 5, (4)(c) (emphasis added).

On March 22, 2000, Scott's filed a motion for clarification based on its position that the period across which damages would be allocated should be 1976 to and including 1988. On March 27, 2000 I granted Scott's motion.

On March 29, 2000, Lexington filed a response to Scott's motion for clarification pointing out that in the May 28, 1998 Order, I found that the ground contamination was discovered "no earlier than 1989." After review of the briefs and evidence submitted, I am persuaded that damages should be allocated from 1976 to and including 1988.

In 1998, Scott's stated in a partial summary judgment motion brief that "[it] did not discover this contamination until 1989, when Scott's hired environmental consultants to test soil and groundwater at its facility." Scott's Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, p. 4 citing Affidavit of Mark E. Goldstein, ¶ 11. (emphasis added). In March 2000, however, Scott's submitted evidence that the ground contamination was discovered in 1988. *See* Exhibit A, p. 25, Scott's Offer of Proof, the October 26, 1988 "Phase I Groundwater Site Investigation Report" prepared by Harding Lawson Associates (The primary chemical constituents detected in ground water at the SLG

[Scott's Liquid Gold] facility are . . . *TCA*, TCE, VM & P, and Corvus oil.). *Id.*. at p. 25 (emphasis added). Moreover, Scott's reliance on the Goldstein Affidavit, ¶ 11 to support its earlier statement that the contamination was discovered in 1989 is unjustified. Paragraph 11 provides:

> In 1988, on its own initiative, Scott's hired an environmental consulting firm to perform testing of the soil and groundwater beneath Scott's facility. The consultants detected that the soil and groundwater were contaminated with TCA. . . . Prior to this time, Scott's had no reason to believe that the soil and groundwater were contaminated or that TCA had escaped form its storage tank or the underground pipes.

Goldstein Affidavit, ¶ 11. (emphasis added). Consequently, I affirm my March 27, 2000 finding that the period across which damages allocable to Lexington will be calculated is 1976 to and including 1988, or 13 years.

I calculate the maximum amount of the damages allocable to Lexington by dividing the total that Scott's paid in settlement for the contamination, $6,312,286, by 13, the number of years the contamination occurred to and including 1988, the year of its discovery.

| | |
|---|---|
| Scott's Settlement Payments: | $6,312,286 |
| Number of years at issue (1976–1988): | 13 |
| $6,312,286/13 = | $ 485,560 |

Based on these calculations and pursuant to *Wallis II*, the maximum amount Lexington is obligated to pay for its single policy year, 1980–1981, is $485,560. It is undisputed that the total amount of Scott's unreimbursed liability is $393,286.00. *See* July 2, 1998 Stipulations, ¶ 1A. Based on the maximum amount of the damages allocable to Lexington of $485,560, I conclude that the amount of damages allocable to and owed by Lexington is $392,286. *See Wallis II.*

**B. Scott's Unreimbursed Defense Costs Arising from the Army and SACWSD Claims**

Based on provisions contained in the Lexington insurance policy Scott's seeks payment from Lexington for $373,-158 in outstanding defense costs arising from the Army and SACWSD claims. *See* July 2, 1998 Stipulations, ¶ 1B. I decline to award these defense costs to Scott's.

According to Scott's, as part of negotiations with its primary insurers, Scott's sought and obtained $681,110 in defense costs reimbursements from the underlying carriers other than Travelers and Aetna. Scott's admits candidly, however, that after it settled with these carriers, it became aware of an additional $373,158 in unidentified defense costs that had not been submitted for payment. Thus, according to Scott's, "it was too late to obtain reimbursement from the underlying carriers [other than Travelers and Aetna]." *See* Plaintiff's Trial Brief, p. 6. Scott's never submitted these costs to Travelers or Aetna because "Scott's was well along in negotiations with Travelers and Aetna towards a settlement that did not include additional defense costs payments." *Id.*

Rather than jeopardize the anticipated settlement by asking for the additional defense costs, Scott's elected to settle with Travelers and Aetna. without seeking payment of these defense costs from these primary insurers. *Id.* Scott's now turns to Lexington for payment of these costs.

**1. Covered "Occurrence"**

With respect to payment of costs, Lexington Policy Number 5101186 provides, in part:

> I. Coverage—To pay on behalf of the insured the **ultimate net loss** in excess of the retained limit hereinafter defined, which the Insured shall become legally obligated to pay as damages by reason of the liability imposed upon the Insured by law, or assumed by the insured under contract because of. . . . (b) Property Damage . . . as defined herein and **caused by or arising out of an occurrence.**

Pltf. Ex. 3, Lexington Policy, § 1.

The policy defines the phrase "ultimate net loss" as follows:

9. Ultimate Net Loss—*Except as provided in Insuring Agreement II, "Defense," the term "Ultimate Net Loss"* shall mean the total sum which the Insured ... become[s] obligated to pay by reason of ... Property Damage ... either through adjudication or compromise, and *shall also include all sums paid for* settlement, adjustment, investigation and *defense of claims* ....

The Company shall not be liable for expenses as aforesaid when such are covered by underlying policies of insurance.

Pltf. Ex. 3, Lexington Policy. (emphasis added). Based on this plain, unambiguous language, the Lexington policy, by its own terms, provides for payment of defense costs unless: 1) they are "covered by underlying policies of insurance," *see* Policy § I definition of "ultimate net loss;" or 2) they arise from an occurrence "not covered under the underlying insurance ... or under other underlying insurance collectible by the Insured." *Id.* at § II. It is the law of this case that Scott's TCA ground contamination was a covered occurrence from 1976 through 1988. Therefore, the coverage afforded in § 1 is applicable.

It is undisputed that although these unpaid defense costs were covered by Aetna's insurance policy, Scott's chose not to submit them to Aetna. Under these circumstances, Lexington is not liable for Scott's $373,158 in unpaid defense costs.

## 2. Duty to Defend

In the alternative, Scott's seeks payment of these unpaid costs pursuant to the following "duty to defend" policy provision:

II. Defense, Settlement, Supplementary Payments—Solely as respects occurrences covered under this policy... but not covered under the underlying insurance ... or under other underlying insurance collectible by the Insured, the Company shall ... defend any suit against the Insured alleging liability insured under the provisions of this policy....

Pltf. Ex. 3, Lexington Policy. (emphasis added).

Scott's contends that under § 2, Lexington had a duty not only to indemnify Scott's, but also to defend Scott's in the underlying lawsuit when Aetna, Scott's primary insurer, wrongfully denied coverage. According to Scotts, had Lexington abided by its policy terms, and defended and indemnified Scott's when its obligation first arose, the damages Scott's incurred and now seeks to recover from Lexington would have been avoided.

Scott's complaint contained no claim for breach of duty to defend. Nor was this theory of relief mentioned in its summary judgment motion. Under these circumstances, analysis of Scott's claim for unpaid defense costs is limited to § 1 of Lexington's policy.

## C. Costs Incurred by Scott's to Establish a Covered Occurrence Allocable to Lexington

In its June 16, 1998 trial brief, Scott's sought a "Wallis" offset in the amount of $354,225 in attorneys' fees and costs incurred in obtaining insurance recoveries from various insurers other than Lexington. In an apparent redefinition of this relief sought, Scott's now seeks "[t]he amount of attorneys' fees and costs incurred by Scott's to establish a covered occurrence during the period from 1976 through and including 1988 which benefitted Lexington and are therefore allocable to Lexington." March 17, 2000 Scheduling Order, p. 3. To the extent the relief sought is a "Wallis" offset, I deny Scott's request.

As discussed above, the *Wallis I* court held that an insured should be allowed to "pick and choose" a single policy from among several triggered policies to indemnify the insured for "any and all sums" for which the insured was liable. *See Wallis I,* 955 P.2d at 572. The *Wallis I* court held further that the trial court erred in setting off Public Service's settlements with its other insurers, without requiring Wallis to pay for PSC's costs and attor-

neys fees incurred in obtaining those settlements by deducting the fees and costs from the settlement set-off. *Id.*

Under the "common fund" doctrine, a theoretical underpinning of the "pick and choose" allocation method, "those who share in the benefit of litigation should also share its costs." *Id. citing Castellari v. Partners Health Plan of Colorado, Inc.,* 860 P.2d 593, 595 (Colo.App.1993). Thus, under the "pick and choose" method, the insurers' *quid pro quo* for sharing in the benefit of settlement setoffs is payment of a proportionate share of attorneys' fees and costs incurred in obtaining those settlements. *See County Workers Compensation Pool v. Davis,* 817 P.2d 521 (Colo. 1991); *Drake v. Insurance Co. of North America,* 736 P.2d 1244 (Colo.App.1986).

Pursuant to the *Wallis II* Court's rejection of the "pick and choose" allocation method, in Colorado, settlement payments are no longer set off in calculating an insurer's share of liability of a covered loss among multiple insurers. Therefore, *a fortiorari,* there is no "benefit" to justify requiring an insurer to pay a share of attorneys' fees and costs incurred by the insured in obtaining settlements. I conclude, therefore, that Lexington is not liable for the $354,225 in attorneys' fees and costs incurred by Scott's in obtaining settlements from Scott's primary insurers and other excess insurers.

### D. Attorneys' Fees and Costs Incurred by Scott's in This Case

Generally, under the American Rule, in the absence of a statute, court rule, or private contract to the contrary, attorneys' fees are not recoverable by the prevailing party in a contract action. *Flannery v. Allstate Ins. Co.,* 49 F.Supp.2d 1223, 1232 (D.Colo.1999)(J.Babcock) *citing Bernhard v. Farmers Ins. Exchange,* 915 P.2d 1285 (Colo.1996); *see also Bunnett v. Smallwood,* 793 P.2d 157, 160 (Colo.1990); *Beebe v. Pierce,* 185 Colo. 34, 521 P.2d 1263, 1265 (Colo.1974); *Rhodes v. Copic Ins. Co.,* 819 P.2d 1060 (Colo.App.1991).

Colorado's appellate courts have recognized exceptions to the American Rule in at least five different circumstances: 1) the "common fund" doctrine is applicable; 2) a party has exhibited bad faith and lack of candor in dealing with the court; 3) breach of fiduciary duty; 4) breach of trust; and (5) a party's wrongful act has proximately caused the wronged party to become engaged in litigation with others. *See Bernhard,* 915 P.2d at 1287 n. 3.

Relying on the contract exception to the American Rule, Scott's argues that the following language of the Lexington insurance policy provides for attorneys' fees:

**II. Defense, Settlement, Supplementary Payments**—Solely as respects occurrences covered under this policy ..., the Company shall:

> (c) reimburse the Insured for **all reasonable expenses incurred at the Company's request** ( including actual loss of wages or salary, but not loss of other income, not to exceed $75 per day) **because of his attendance at hearings or trials at such request.**

Plaintiff's Partial Summary Judgment Motion, Ex. 6, § II(c).

In *Flannery,* in which an insured sought declaratory judgment and brought breach of contract claims against its insurer, I construed the following similar language:

> We will pay, in addition to the limits of liability: ... any ... reasonable expenses incurred by an insured person at our request.

*Id.* at 1232. Relying on *Allstate Ins. Co. v. Robins,* 42 Colo.App. 539, 597 P.2d 1052 (1979)(insured granted reimbursement for attorneys' fees incurred in declaratory judgment action), I concluded that the insured was entitled to attorneys' fees incurred in bringing suit against the insurance company. The award was based, in part, on the following rationale relied on by the *Robins* court:

(D)espite the qualifications placed upon [the American Rule] by the court, it still appears to be unfair to the insured. After all, the insurer had contracted to defend the insured, and it failed to do so. It guessed wrong as to its duty, and should be compelled to bear the consequences thereof. If the rule laid down by these courts should be followed by other authorities, it would actually amount to permitting the insurer to do by indirection that which it could not do directly. That is, the insured has a contract right to have actions against him defended by the insurer, at its expense. *If the insurer can force him into a declaratory judgment proceeding and, even though it loses in such action, compel him to bear the expense of such litigation, the insured is actually no better off financially than if he had never had the contract right mentioned above.*

*Flannery*, 49 F.Supp.2d at 1232 *citing* A.J. Appleman, Insurance Law & Practice § 4691 (1962).

Lexington states, however, that in *Bernhard* the Colorado Supreme Court effectively foreclosed fee applications in coverage cases. Lexington's reliance on *Bernhard* is misplaced.

In *Bernhard*, the issue was whether an action based on a breach of a quasi-fiduciary should be analogized to an action based on breach of a fiduciary duty and, thus, be treated as an exception to the American Rule. *See Bernhard*, 915 P.2d at 1289. Here, as in *Allstate*, the request for attorneys' fees is grounded in the contract exception to the American Rule. *See Flannery*, 49 F.Supp.2d at 1233.

▮ Lexington contends further that the additional language in this case limiting reimbursement of expenses to "attendance at hearings or trials" does not include attorneys' fees incurred in preparation for such hearings or trials. *See* Lexington's Reply Brief Re: Damages, p. 7. I am not persuaded. In light of an attorney's obligations to a client and to the Court, I

decline to adopt such a cramped view of the policy language.

Inasmuch as *Robins* is viable precedent, I hold that Scott's may recover its reasonable attorneys' fees in prosecuting this action against Lexington. "[A] contrary holding would reward insurers who force their insureds to file claims for declaratory relief after the underlying litigation concludes." Indeed, the insurer who fails to file a declaratory action after the conclusion of the underlying litigation is not substantively different than the insurer who promptly files a declaratory action—both "request" an insured to incur attorneys' fees as defined by *Robins*. *See Flannery*, 49 F.Supp.2d at 1233.

### E. Pre-judgment Interest Accrual Date

▮ Scott's seeks pre-judgment interest at the statutory rate of 8% compounded annually from no later than November 6, 1996, the date Scott's settlement with the Army was approved by the Court. Lexington argues that prejudgment interest did not begin to accrue until the indemnifiable amount ultimately netted out in January 1998.

▮ Interest issues in contract cases are controlled by state law. *Illinois Surety Co. v. John Davis Co.*, 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206 (1917); *Southern Painting Co. of Tennessee v. United States for the Use of Silver*, 222 F.2d 431 (10th Cir.1955). Therefore, I apply Colorado state law.

▮ In Colorado, prejudgment interest begins accruing when money has been "wrongfully withheld" § 5–12–102(1), C.R.S. Section 5–12–102(1) is to be liberally construed to permit recovery of prejudgment interest on money or property wrongfully withheld. *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 684 (Colo.1994) *citing Westfield Dev. Co. v. Rifle Inv. Assoc.*, 786 P.2d 1112, 1122 (Colo.1990); *Britvar v. Schainuck*, 791 P.2d 1183, 1185 (Colo.App.1989). One who is damaged by

a breach of contract is entitled to recover prejudgment interest of eight percent annually from the time of the breach. *Mesa Sand & Gravel Co. v. Landfill, Inc.,* 776 P.2d 362, 365 (Colo.1989); *see also Wall v. Foster Petroleum Corp.,* 791 P.2d 1148, 1151 (Colo.App.1989) (plaintiff entitled to interest from time cause of action accrues). Therefore, I determine when Lexington breached its duty to indemnify Scott's.

Pursuant to a November 6, 1996 settlement agreement, Scott's became legally obligated to pay $6.2 million to the Army and SACWSD upon signing the settlement agreement. *See* Stipulation, Attachments 4, 5. On that same date, Scott's paid the Army $1 million due upon signing of the settlement agreement.

Lexington contends prejudgment interest on the amount of Scott's unreimbursed liability to the Army and SACWSD does not begin to run until Aetna settled with Scott's on January 12, 1998 and the underlying policy was "exhausted." Lexington's argument ignores the following "Loss Payable" clause of its policy:

> "Liability of the Company under this policy with respect to any occurrence shall not attach unless and until the Insured, or the Insured's underlying Insurer, shall have paid the amount of underlying limits on account of such occurrence."

Pltf. Ex. 3, Lexington Policy ¶ 10. Based on this provision, written in the disjunctive, Lexington's liability attached upon Scott's November 6, 1996 payment of $1 million in damages to the Army as a result of an "occurrence" covered by Lexington's policy even though Aetna, the underlying carrier, had not yet made payment.

## III.

### Conclusion

Scott's is entitled to payment in the amount of $392,286 from Lexington for its share of Scott's unreimbursed settlement payments plus interest calculated from November 6, 1996. Lexington, however, is not liable for $373,158 in unreimbursed defense costs incurred by Scott's in the underlying litigation with the Army. Nor, pursuant to *Wallis II,* is Scott's entitled to $354,225 in attorneys' fees and costs incurred in obtaining settlements from its primary insurers and other excess insurers. However, Scott's may recover its reasonable attorneys' fees in prosecuting this action against Lexington.

Accordingly, IT IS ORDERED that:

1. Lexington Insurance Company SHALL PAY Scott's Liquid Gold–Inc. $392,286.00 plus interest calculated at the rate of eight (8) percent per annum from November 6, 1996 to the date judgment enters;

2. Lexington is NOT LIABLE for $373,158 in unreimbursed defense costs incurred by Scott's in the underlying litigation with the United States Army;

3. Scott's is NOT ENTITLED to $354,225 in attorneys' fees and costs incurred in obtaining settlements from its primary insurers and other excess insurers; and

4. Lexington Insurance Company SHALL PAY Scott's Liquid Gold–Inc. $139,604 in reasonable attorneys' fees and costs incurred by Scott's in prosecuting this action through May 31, 1998. Upon submission of supporting documentation within 10 days of entry of judgment, Scott's is awarded attorneys' fees and costs incurred in this action from June 1, 1998 through the date of entry of judgment.